UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

INTERNATIONAL MARKETS LIVE, INC.,
dba iMARKETSLIVE;

      Plaintiff,

  v.

SCOTT HUSS, an individual,

      Defendant.

## COMPLAINT

1.      Plaintiff International Markets Live, Inc. ("IML") brings this complaint against Scott Huss for trade secret misappropriation in violation of the Defend Trade Secrets Act and for breach of contract, tortious interference, and unfair competition under the laws of the State of New York.

## INTRODUCTION

2.      IML is an American software and educational platform company that, through its various academies and software products, provides its customers with educational tools, information, and support to help them better understand financial markets such as foreign exchange and crypto currency markets, and so to trade more effectively. IML has tens of thousands of customers worldwide.

3.      IML's sales organization relies on Independent Business Owners ("IBOs" or "affiliates"), who market and sell IML products and sponsor new affiliates. The relationship

between IML and its affiliates is a critical one, and IML depends upon its affiliates to live up to their contractual obligations, including to preserve confidentiality, act loyally, and work in the parties' mutual interest.

4.      Mr. Huss, a novice when IML accepted him as an affiliate about three years ago, accepted each of these obligations.  In exchange, IML invested in him, trusted him with its confidential material and trade secrets, and taught him the business.  By training him, mentoring him, and equipping him with its proprietary information and trade secrets, IML propelled Mr. Huss to quick success.  Indeed, according to Mr. Huss, he had only "been in the business for about six months" when he "hit a six-figure residual income."[1]  And, as he stressed at the time, his success was a product of IML's investment in him.  Telling new recruits that they could excel as quickly as he did, he explained:  "I truly believe it's completely possible for all of you, if you really just master the techniques that I have mastered, go through the learning, go through the books, go through the audios, have the mentors, have the development, and if you go through the process, anything that goes through the process has to work." *Id.*  Three years later, in March 2020, again teaching new recruits how to employ the tools with which IML entrusted him, Mr. Huss boasted that IML had recognized him as a "Chairman 25," which refers to a status and compensation level at IML, and "currently, about to go Chairman 50 here, very, very soon."[2]

5.      Just weeks later, Mr. Huss spurned the trust IML placed in him, breached his contractual obligations, secretly joined a competing business, and recruited away IML affiliates to leave IML and join him in his new business.  Without informing IML of his new business, Mr. Huss stayed on with IML in parallel in order to steal the proprietary and trade secret tools and information with which IML entrusted him—business strategies, compensation schemes, customer lists, affiliate lists, prospect lists, trading strategies and techniques, and other materials.  When

[1] https://www.youtube.com/watch?v=fwVcnFuu18M  (posted May 11, 2018).

[2] https://www.youtube.com/watch?v=-PPpbpP4KWY (posted March 22, 2020).

IML learned of Mr. Huss' treachery, IML terminated him and admonished him to live by the agreements he made.  Mr. Huss responded by casting aspersions on IML, its products and people to damage IML's business and to benefit himself.  And, though still bound by his contractual obligations to IML, Mr. Huss deployed IML's trade secrets and proprietary tools and information for his own personal use and for the benefit of others, including Well Beyond ("WB"), an IML competitor.  Mr. Huss misused IML's proprietary tools and trade secrets to great effect, achieving an elite status at WB in "record" time.[3]

6.      IML brings this suit to protect its trade secrets and proprietary tools and information, to hold Mr. Huss to his contractual obligations, and to stop the harm that he is deliberately inflicting on IML's business and its remaining affiliates.

## THE PARTIES

7.      Plaintiff International Markets Live, Inc. ("IML") is a New York corporation with its principal place of business in Las Vegas, Nevada.  IML is a software and educational platform company that provides its customers with educational tools and information about financial markets and trading, including foreign and crypto currencies.

8.      Defendant Scott Huss is an individual who lives in Miami, Florida and is a citizen of Florida.  Mr. Huss is a former IML affiliate who, in violation of his contractual obligations to IML, competes directly with IML and unlawfully misappropriates IML proprietary information, including IML's trade secrets, to solicit IML customers, affiliates, and affiliate prospects.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this matter involves claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et*

---

[3] http://voyagemia.com/interview/meet-scotty-huss-apex-marketing-inc-downtown/;
https://www.businessforhome.org/2020/06/scotty-huss-achieves-executive-ambassador-rank-at-beyond/

*seq*., and concerns trade secrets that relate to products and services that are used in or intended for interstate or foreign commerce.

10.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity between IML and Defendant Huss and the amount in controversy exceeds $75,000.

11.     This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367, because these claims form part of the same case or controversy, and involve Mr. Huss's theft and use of IML's trade secrets and proprietary tools and information to establish a competing business in violation of his contractual obligations to IML.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.  Mr. Huss lives and works in this District, conducted business for IML in this District, stole and used IML's trade secrets in this District, and solicited IML's customers, affiliates, and prospects in this District. Moreover, Mr. Huss consented to litigation of claims arising from his misappropriation of IML trade secrets and his violation of his IML contracts by seeking to have such claims heard in this District.  *See International Markets Live, Inc. v. Scott Huss*, 20-cv-00866, Docket No. 15, at *1 (D. Nevada) (Scott Huss Motion to Dismiss or Transfer Venue stating "Alternatively, Defendant requests transfer of this matter to the United States District Court, Southern District of Florida.").

**<u>MR. HUSS BREACHED HIS CONTRACTS, STOLE IML'S TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION, AND IS USING THEM FOR HIS OWN BENEFIT</u>**

**A.     IML uses IBO Agreements and its Policies and Procedures to protect its business and its trade secrets**

13.     IML provides its customers with software, educational tools and information about financial markets and trading, including foreign and crypto currencies.  Its products are distributed under a direct sales model and are offered to individuals on a subscription basis.  IML's products

consist of tools, information, and support to help customers better understand these financial markets and trade effectively.

14.     IML contracts with affiliates in an independent contractor relationship to effectuate the direct sales model of its products and services.  These contracts are called IBO Agreements. All prospective affiliates must enter into an IBO Agreement requiring compliance with IML's Policies and Procedures before becoming an affiliate and before distributing IML's products and services.  These Policies and Procedures are updated from time to time, and all affiliates agree to comply with the Policies and Procedures that are in force at any given point in time during their tenure.

15.     IML's Policies and Procedures, which are attached as Exh. A (P&P), require, among other things, that:

- Affiliates may not directly or indirectly recruit other affiliates or customers for other network marketing businesses;

- Affiliates may not participate as a distributor in another network marketing company that sells and distributes similar products to IML;

- Affiliates must not sell, or attempt to sell, any competing non-IML programs, products, or services to IML affiliates or customers;

- Affiliates must keep trade secrets and confidential proprietary tools and information (including business reports, lists of Customer and affiliate names and contact information, and any other financial, technical or other confidential business information) secret, must use them only to advance their joint business with IML, and must return them should their relationship with the company end;

- Affiliates must present IML corporate and services information in an accurate and professional manner;

- Affiliates are prohibited from making social media postings that are false, misleading, or deceptive, including false or deceptive postings relating to the IML income opportunity, IML's products and services, and an affiliate's biographical information and credentials;

- Affiliates' advertising and all forms of communication must adhere to principles of honesty and propriety; and that

- Affiliates must safeguard and promote the good reputation of IML and the services and products it markets.

16.     An affiliate's obligations to IML—including the prohibition on dissemination and unauthorized use of trade secret and confidential proprietary information, and the prohibition on certain competitive activities—survive the termination of the affiliate's relationship with IML. IML may terminate an affiliate's position, *inter alia*, for violation of any terms of an IBO Agreement (including the Policies and Procedures in effect at the time the violation occurred or was discovered), or for engaging in unethical business practices or violating standards of fair dealing.  In addition, affiliates agree that a violation of the provisions barring solicitation of customers, affiliates, and prospects for other companies or services shall constitute unreasonable and unwarranted contractual interference between IML and its affiliates and/or customers and would inflict irreparable harm on IML.  Each affiliate also acknowledges that IML's trade secrets and proprietary tools and information are of such value and nature that their disclosure or use in violation of the IBO Agreement (including the Policies and Procedures) will result in irreparable damage to IML and to independent IML businesses, and that IML and its affiliates will be entitled to injunctive relief or to recover damages against any affiliate who violates applicable confidentiality and trade secret provisions.

**B.**    **As an affiliate, Mr. Huss agreed to comply with IML's IBO Agreement and its Policies and Procedures and to act in his and IML's mutual interest**

17.    Mr. Huss applied to become an affiliate, entered into an IBO Agreement, and agreed to comply with IML's Policies and Procedures.  At all relevant times, Mr. Huss knew and was aware of the terms of the IML Policies and Procedures, including the prohibitions against soliciting IML's customers, affiliates, and prospects for other companies or other services, and the prohibition against disseminating IML's trade secrets and proprietary tools to anyone outside IML or using them for any purpose other than his business with IML.  At all relevant times, Mr. Huss also knew that his obligations to IML—including the prohibition on dissemination and unauthorized use of trade secret and confidential proprietary information, and the prohibition on certain competitive activities—survive the termination of his relationship with IML.

**C.**    **Mr. Huss stole its trade secrets and proprietary tools and information and violated his contractual obligations**

18.    Beginning in at least April 2020, Mr. Huss breached his contractual obligations. He solicited and recruited IML's customers, affiliates, and prospects to leave IML and join his new venture.  Mr. Huss used the confidential and trade secret information he obtained from IML about its affiliates and genealogy—which he drew from IML's affiliate lists and other similar materials and information made available to him in his capacity as an affiliate—to identify IML leaders and other influential affiliates who could make the greatest impact for WB, and whose departure would most hurt IML and its remaining affiliates, and then recruited them.  Likewise, Mr. Huss used the confidential and trade secret information he obtained from IML about its customers and prospects—which he drew from IML's customer lists and other similar materials and information he obtained as an affiliate—to target existing customers and potential customers and affiliates.  For example, in May, IML was contacted by an IML affiliate, who reported that Mr. Huss had solicited him and other affiliates to leave IML and join a competing business in violation of IML's IBO Agreement.  To hide his duplicity, Mr. Huss required those he was recruiting to sign non-disclosure agreements.  As another example, on May 9, 2020, Mr. Huss

texted a prospect and sought to recruit him, writing: "Hey. I may resign from iML. Going to disrupt the industry and do the biggest thing I've ever done. Keep between us."

19.     When IML learned of this treachery, Jason Brown of IML conducted a preliminary investigation. He discovered that Mr. Huss contacted a number of influential IML affiliates to join his new venture, in violation of his (and their) contractual obligations. Mr. Brown ultimately determined that, by mid-May, Mr. Huss had recruited hundreds of IML affiliates and customers to his new venture. IML suspended Mr. Huss and demanded that Mr. Huss cease and desist his misappropriation and use of IML's trade secrets and his ongoing breach of his contractual obligations. Mr. Huss has refused and continues to misappropriate IML's trade secrets, and to breach his confidentiality obligations and other agreements with the company.

20.     Mr. Huss committed these acts intentionally, knowing that IML's customers and affiliates were under contract, and encouraged them to breach their contracts with IML. He also knowingly and intentionally enticed prospects (both customers and affiliates) away from IML, interfering with IML's ability to close deals with prospective customers and affiliates. He appropriated IML's trade secrets and proprietary tools and information for himself, in violation of his contractual obligations. And when IML learned of his misconduct and terminated him, Mr. Huss refused to stop using IML's trade secrets and proprietary tools and information, again in violation of his contractual obligations.

21.     To this day, Mr. Huss continues to recruit IML customers, affiliates, and prospects to join his new venture and to compete with IML. And he continues to use IML's trade secrets (including its lists of customers, affiliates, and prospects) to do so, for example by using his trade secret knowledge of IML's genealogy, affiliates, customers, and prospects to identify impactful affiliates, customers, and prospects to recruit. Indeed, in mid-July Mr. Huss used this information and then collaborated with others on a targeted strike to recruit IML leaders—confirmed by a prep-talk to his conspirators, in which he said: "You know what it is, man. We're playing this game

like it's a sport, we got our track suits on.  Everybody going in, we got like 40 meetings lined up tomorrow at the condo, non-stop, recruiting every leader at IML. Let's goooooo."  As another example, WB launched its products and services on or about July 13, 2020, and Mr. Huss is promoting these products and services (and the opportunities to sell them) in videos posted on the "Beyond Trading" Facebook page.[4]  Among the products and services that Mr. Huss is promoting and selling is a financial trading application for foreign exchange, futures, and crypto currencies that appears tailored to compete directly with IML's financial market products and services.  Mr. Huss helped promote this product during its pre-launch phase, continues to solicit customers to purchase (and affiliates to sell) access to this platform and, upon information and belief, relied on IML trade secrets and proprietary tools and information to influence the design and to promote and sell these products and services.  *Id.*

**D.      Mr. Huss has benefitted, and continues to benefit, from his improper conduct at IML's expense**

22.      By misappropriating IML's trade secrets and proprietary tools and information, and by competing with IML in ways that violate his contractual obligations, Mr. Huss has already achieved personal gain—as noted, he achieved "Platinum Ambassador status"—an elite income status—at WB in a "record" 12 days, and Executive Ambassador status—a status above Platinum Ambassador—in his first 20 days, and stands to gain much more.  Conversely, Mr. Huss's misconduct has already cost IML customers, affiliates, and prospects, damaged its reputation, disrupted its business, forced it to compete against its own trade secrets and proprietary tools and information, put those trade secrets and proprietary information at risk of public dissemination, and caused financial harm.  Like Mr. Huss's misconduct, these harms continue to accrue unabated and, with WB's formal launch last week, are poised to accelerate.

---

[4] https://www.facebook.com/pg/sucesstrader/posts/.

23.     Any and all conditions precedent to IML bringing this action have been satisfied and/or waived by Defendant Huss.

## FIRST CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act)

24.     IML incorporates by reference paragraphs 1–23 above, as though set forth fully herein.

25.     IML's confidential, proprietary, and trade secret information, including lists of customers, affiliates, prospects, and their contact information, its business strategies, compensation schemes, trading strategies and techniques, and other materials and other financial, technical or other confidential business information, are protected under the DTSA.  18 U.S.C. § 1836 *et seq*.

26.     IML's confidential, proprietary, and trade secret information relates to the organization and operation of its business, its business strategies, sales organization, and sales techniques, and the products and services it offers to customers.  This confidential, proprietary, and trade secret information goes to the heart of IML's business and relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

27.     This information is neither readily ascertainable to IML's competitors or the public, nor available to them through proper means, and derives independent economic value from these facts.  IML obtains significant economic benefits with respect to its competitors because of this information.

28.     IML implements reasonable measures, including the use of confidentiality agreements, to maintain the secrecy and confidentiality of this information.  For example, IML advises affiliates and requires them to acknowledge that "business reports, lists of Customer and

IBO names and contact information and any other information, which contain financial, technical or other information both written or otherwise circulated by IML or pertaining to the business of IML (collectively, 'Reports'), are confidential and proprietary information and trade secrets belonging to IML," and requires its affiliates to treat them accordingly.  Exh. A (P&P) §12.  IML's Policies & Procedures bar the use of such documents and information except to promote the affiliate's business with IML, and expressly bar the use of such material to solicit customers or IML's affiliates to other products or ventures.  *Id.*  IML also employs secure access to its portal (through which affiliates access company products and information) and dynamically updates its access restrictions multiple times a day to ensure that only authorized personnel at any given point in time can enter the portal and access company products and information.  The company also compartmentalizes access to information about its genealogy, affiliate and customer information, and other trade secret information, and restricts access to communications, information, and events not germane to an affiliate's business.

29.     Mr. Huss misappropriated and misused IML's confidential information in violation of the DTSA.  By virtue of his relationship and contractual agreements with IML, Mr. Huss was obligated to use IML's confidential information only for the purpose of furthering his joint business with IML and to keep this information confidential.  Despite this, Mr. Huss disclosed and used the information to undermine IML's business, steal its customers, affiliates, and prospects, as described above.

30.     Mr. Huss has violated, and continues to violate, the express provisions of his IBO Agreement pertaining to the ownership and use of IML trade secrets and has refused to cease and desist his misuse of IML's proprietary and trade secret information when asked by the company to do so.  His conduct thus constitutes the willful and malicious misappropriation of IMF's trade secrets.

31.     IML has suffered and will continue to suffer damage and irreparable harm, absent injunctive relief.  IML's legal remedy is inadequate, so it seeks injunctive relief to halt Mr. Huss's misuse and dissemination of its confidential, proprietary, and trade secret information and to recover the benefits that information confers. As Mr. Huss acknowledged through his affiliate documents, the unauthorized disclosure or use of IML's proprietary information causes irreparable damage to IML.

32.     IML is entitled to injunctive relief, restitution, compensatory and exemplary damages, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836 *et seq*.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract)**

33.     IML incorporates by reference paragraphs 1–23 above, as though set forth fully herein.

34.     Mr. Huss entered into an IBO Agreement that includes the Policies and Procedures in force during his affiliation with IML, in which both sides agreed to be bound by various obligations and duties in exchange for consideration.  *See* Exh. A.

35.     At all relevant times herein, IML performed the obligations and duties required of it by its contracts with Mr. Huss.

36.     Mr. Huss breached his contracts with IML by failing to perform his obligations and duties according to the terms of his contracts with IML, including by taking and using IML's confidential and trade secret information without IML's permission and adverse to IML's interests, by recruiting IML's customers, affiliates, and prospects to a competitive venture, by competing with IML's business in ways that violate his agreement(s) with IML, and by making disparaging remarks about IML, as described above.

37.     Mr. Huss's breaches of contract have caused substantial damages.

38.     IML is entitled to injunctive relief, restitution, compensatory and consequential damages, and reasonable attorneys' fees pursuant to the laws of the State of New York.

## THIRD CLAIM FOR RELIEF
### (Tortious Interference with Contractual Relations)

39.     IML incorporates by reference paragraphs 1–23 above, as though set forth fully herein.

40.     IML had and continues to have contractual relationships with customers who receive products in exchange for monetary compensation.  IML also had and continues to have contractual relationships with affiliates who receive products and services from, and provide services to and on behalf of, IML in exchange for monetary compensation.

41.     Mr. Huss knew and continues to be aware of these relationships.

42.     Mr. Huss spread false information and used IML's confidential information and trade secrets to form relations with IML's customers and affiliates to profit himself and his business associates, and continues to do so.  In so doing, he intentionally and knowingly procured a breach by these third-party customers and affiliates of their contractual obligations and duties to IML.

43.     Mr. Huss's conduct was the proximate cause of these third-party breaches and was not legally justified.

44.     As a direct and proximate result of Mr. Huss's interference with IML's contractual relationships, IML has suffered substantial damages.

45.     IML is entitled to injunctive relief, restitution, compensatory, consequential and punitive damages, and reasonable attorneys' fees pursuant to the laws of the State of New York.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference with Prospective Economic Advantage)

46.     IML incorporates by reference paragraphs 1–23 above, as though set forth fully herein.

47.     IML had and continues to have prospective contractual relationships with customers who desired to receive products in exchange for monetary compensation.  IML also had and continues to have prospective contractual relationships with affiliates who desire to receive products and services and to provide services to IML in exchange for monetary compensation.

48.     Mr. Huss knew and continues to be aware of these prospective relationships.

49.     Mr. Huss acted by wrongful means, including by spreading false information and using IML's confidential information and trade secrets, with the intent of preventing and inhibiting IML's relationships with prospective customers and affiliates, and continues to do so.  Mr. Huss's wrongful conduct achieved its end and was the proximate cause of such third parties failing to enter into contracts with IML.

50.     Mr. Huss's conduct was not legally justified.

51.     As a direct and proximate result of Mr. Huss's interference with prospective contractual relationships, IML has suffered significant damages.

52.     IML is entitled to injunctive relief, restitution, compensatory, consequential and punitive damages, and reasonable attorneys' fees pursuant to the laws of the State of New York.

## FIFTH CLAIM FOR RELIEF
### (Unfair Competition)

53.     IML incorporates by reference paragraphs 1–23 above, as though set forth fully herein.

54.     Mr. Huss misappropriated IML's labors, skills, expenditures, and good will, including by stealing and using IML's confidential and trade secret information without IML's permission and adverse to IML's interests, by recruiting IML's customers, affiliates, and prospects to a competitive venture, and by competing with IML's business in ways that violate his agreement(s) with IML, as described above.

55.     Mr. Huss's conduct was willful and committed in bad faith.

56.     This conduct harmed IML and its business financially, reputationally, and irreparably.

57.     As a direct and proximate result of Mr. Huss's conduct, IML has suffered significant damages.

58.     IML is entitled to injunctive relief, restitution, compensatory, consequential and punitive damages, and reasonable attorneys' fees pursuant to the laws of the State of New York.

## PRAYER FOR RELIEF

WHEREFORE, IML prays for the following relief:

A.     **Judgment in IML's favor and against Mr. Huss on all causes of action alleged herein;**

B.     **Preliminary and permanent injunctive relief barring Mr. Huss and all other persons or entities acting in concert or participation therewith from:**

1.     Disseminating or using IML's proprietary, confidential, and trade secret information, including IML customer lists, affiliate lists, prospect lists, compensation schemes, business plans, trading tools and strategies, trademarks, trade secrets, program information and pricing, program materials, educational videos or materials, or any other confidential information;

2.     Continuing to breach his contractual obligations to IML;

3.     Conducting or soliciting any business, accepting any employment by or rendering professional services to, any person or organization that is or was an IML customer, affiliate, distributor, trader, and/or client in violation of his contractual agreements with IML;

4.     Soliciting, recruiting, bribing, and/or enticing IML affiliates and/or traders to violate their contracts with IML and/or misappropriate IML's confidential information and/or intellectual property;

5.     Interfering with IML's contractual relations including, without limitation, its contractual relationships with its affiliates;

6.     Competing with IML in an unfair and unethical manner, thereby misappropriating IML's labors, skills, expenditures, and good will.

**C.      Preliminary and permanent injunctive relief requiring Mr. Huss to:**

1.      Return any equipment, or other materials, including but not limited to, hard copies of documents and/or data, electronic copies of documents and/or data, emails, and any other material containing or referring to any IML customer list, trademark, trade secret, program information, or any other confidential information and/or materials; and

2.      Submit to ongoing auditing and forensic analysis of his personal and work-related systems and accounts to monitor for unlawful retention or use of IML's confidential, proprietary, and trade secret information;

**D.      An accounting and award of compensatory and consequential damages to be proven at trial, but in any case sufficient to undo the financial harm to IML caused by Mr. Huss's actions;**

**E.      An award of exemplary and punitive damages commensurate with Mr. Huss's willful and bad faith conduct;**

**F.      An award of pre-judgment and post-judgment interest, attorneys' fees, disbursements, and costs;**

**G.      And such other relief as the Court deems just and proper.**

DATED:  July 24, 2020                    **Marcos Daniel Jimenez**

Marcos Daniel Jimenez
  Florida Bar No. 441503
Marcos D. Jimenez, P.A.
255 Alhambra Circle – 8th Floor
Miami, Florida 33134
Tel: 305.740.1975
Email: mdj@mdjlegal.com
Email: kvasquez@leoncosgrove.com

Scott B. Cosgrove
  Florida Bar No. 161365
Jeremy L. Kahn
  Florida Bar No. 105277
LEÓN COSGROVE, LLP
255 Alhambra Circle – 8th Floor
Miami, Florida 33134
Telephone:  305.740.1975
Facsimile:  305.437.8158
Email:  scosgrove@leoncosgrove.com
Email:  jkahn@leoncosgrove.com

Douglas E. Lumish (*pro hac vice* to be filed)
Jeffrey G. Homrig (*pro hac vice* to be filed)
Arman Zahoory (*pro hac vice* to be filed)
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600 / (650) 463-2600 Fax
doug.lumish@lw.com
jeff.homrig@lw.com
arman.zahoory@lw.com

*Attorneys for Plaintiff*
*International Markets Live, Inc.*