UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 20-23080-CIV-UNGARO/O'SULLIVAN

INTERNATIONAL MARKETS LIVE, INC.,
d/b/a iMARKETSLIVE,

       Plaintiff,

v.

SCOTT HUSS,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court on the Plaintiff's Expedited Motion for Preliminary Injunction (DE# 37, 9/8/20 ) (SEALED). [1] This matter was referred to the United States Magistrate Judge John J. O'Sullivan by the Honorable Judge Ursula Ungaro for a Report and Recommendation in accordance with 28 U.S.C. § 636(b) and the Magistrate Rules of the Local Rules of the Southern District of Florida. (DE# 27, 9/2/20). The undersigned held an evidentiary hearing on October 29, 2020. (DE# 36, 9/4/20). Having carefully considered the Plaintiff's Expedited Motion for Preliminary Injunction (DE# 37, 9/8/20) (SEALED), the Defendant's Memorandum of Law in Opposition to Plaintiff's Expedited Motion for Summary Judgment (DE# 44, 9/16/20), the Plaintiff's Reply in Support of Its Expedited Motion for Summary Judgment (DE# 48, 9/30/20), the Defendant's Supplemental Memorandum of Law in Opposition to Plaintiff's Expedited Motion for Preliminary Injunction (DE# 71, 11/5/20), the Plaintiff International Markets Live, Inc.'s Response to Defendant Scott Huss's Supplemental

---

[1] On August 4, 2020, the plaintiff filed an unsealed, redacted version of its motion, Plaintiff's Expedited Motion for Preliminary Injunction and Supporting Memorandum of Law (DE# 15, 8/4/20), which should be denied as moot when the Court resolves the Plaintiff's Expedited Motion for Preliminary Injunction (DE# 37, 9/8/20) (Sealed).

Memorandum of Law in Opposition to Plaintiff's Expediated Motion for Preliminary Injunction (DE# 79, 11/12/20), the court file, the evidence in the record and applicable law, the undersigned respectfully recommends that the Plaintiff's Expedited Motion for Preliminary Injunction (DE# 37, 9/8/20) (SEALED) be GRANTED.

## INTRODUCTION

The plaintiff, International Markets Live, Inc. d/b/a iMarketslive ("IML") is a software and educational platform company. IML's sales organization relies on Independent Business Owners ("IBOs" or "Affiliates"), who market and sell IML strategies and services and sponsor new Affiliates. IML Affiliates are independent contractors whose Agreement with IML includes Policies and Procedures ("P&Ps") that contain non-compete provisions and confidentiality provisions that prohibit misuse of IML's trade secrets and recruitment of non-sponsored customers or Affiliates. The defendant, Scott Huss ("Mr. Huss") is a former IML IBO, who worked as an IML IBO for approximately two and a half years. Mr. Huss's relationship with IML was terminated in May 2020. Shortly thereafter, Mr. Huss joined Well Beyond. IML alleges that Mr. Huss stole IML's trade secrets and is using them to steal customers and other IML IBOs. IML seeks a preliminary injunction to stop Mr. Huss's continuing breach and misuse of IML's stolen trade secrets.

Mr. Huss opposes IML's request for injunctive relief on the following grounds: 1) the restrictive covenants are unenforceable because IML's pop-up box for IML's P&Ps does not provide sufficient notice under New York law; 2) that IML's P&Ps cannot be construed as an employment contract under New York law; 3) that the restrictive covenants are unreasonable in scope as to what constitutes a trade secret and prohibiting a party from soliciting any person related to IML; 4) the restrictive covenants are unenforceable for violating reasonable standards

2

of fair dealing because IML never explained the P&Ps to Mr. Huss and Mr. Huss claims he did not understand the P&Ps; and 5) that because the ranks of IBOs and IBO phone numbers are not trade secrets, IML's P&Ps are not necessary to protect any legitimate interest.

## PROCEDURAL BACKGROUND

On July 24, 2020, International Markets Live, Inc. d/b/a iMarketslive (hereinafter "IML" or "plaintiff") filed its Complaint (DE# 1, 7/24/20). The Complaint alleges the following causes of action against Scott Huss (hereinafter "Huss" or "defendant"): misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("DTSA") (Count 1), breach of contract (Count 2), tortious interference with contractual relations (Count 3), tortious interference with prospective economic advantage (Count 4), and unfair competition (Count 5).

On September 8, 2020, the plaintiff filed the Plaintiff's Expedited Motion for Preliminary Injunction (DE# 37, 9/8/20) (SEALED), which seeks preliminary injunctive relief on two claims: (1) misappropriation of trade secrets under the DTSA and (2) breach of contract. On September 16, 2020, the defendant filed the Defendant's Memorandum of Law in Opposition to Plaintiff's Expedited Motion for Summary Judgment. (DE# 44, 9/16/20). On September 30, 2020, the plaintiff filed the Plaintiff's Reply in Support of Its Expedited Motion for Summary Judgment. (DE# 48, 9/30/20). The parties filed numerous supporting documents including declarations and exhibits.

On October 29, 2020, the undersigned held an evidentiary hearing via Zoom on the subject motion. The undersigned admitted into evidence the Plaintiff's Exhibits 1-12, 15-24, 26, 28, 29-31 and 33 and the Defendants Exhibits 1-10. See Exhibit and Witness List (DE# 70, 10/20/20); see also Plaintiff's Notice of Filing its exhibits admitted at the October 29, 2020

evidentiary hearing (DE# 74, 11/9/20). At the evidentiary hearing, the plaintiff presented the live testimony of Jason Brown, Chris Hervey, Scott Huss, Marian Lantigua, and Jared Austin.  The defendant presented the live testimony of Scott Huss.  Deposition transcripts of the following witnesses were admitted under Exhibit 26: Chris Abdey, Anthony Waseskuk, Christina Avila, John Legarreta, and Connor Scott.  The transcript of the October 29, 2020 evidentiary hearing before the undersigned is filed in the Court docket at DE# 71-1.  Cites to the October 29, 2020 evidentiary hearing transcript will be designated as "T. page: line." (DE# 71-1, 11/5/20).

On November 5, 2020, the defendant filed the Defendant's Supplemental Memorandum of Law in Opposition to Plaintiff's Expedited Motion for Preliminary Injunction (DE# 71, 11/5/20).  On November 12, 2020, the plaintiff filed International Markets Live, Inc.'s Response to Defendant Scott Huss's Supplemental Memorandum of Law in Opposition to Plaintiff's Expedited Motion for Preliminary Injunction (DE# 79, 11/12/20). The defendant filed the Defendant's Proposed Findings of Fact and Conclusions of Law (DE# 78, 11/12/20) (hereinafter "Def.'s FOF").  The plaintiff filed its Proposed Findings of Fact and Conclusions of Law and Report and Recommendation as Exhibit 1 to its Notice of Filing (DE# 80, 11/12/20)) (hereinafter "Pl.'s FOF").  The undersigned has taken judicial notice of the Order Denying Defendant's Motion to Compel Arbitration in *Adaeze Duncan v. International Markets Live, Inc.*, Case No. 4:20-cv-00017-RGE-HCA, pending in the United States District Court for the Southern District of Iowa, Central Division.  See Exhibit A attached to Defendant's Unopposed Motion to Take Judicial Notice of Court Order (DE# 77-1, 11/11/20); Order (DE# 81,11/13/20).

The matter is ripe for disposition.

4

## FACTUAL FINDINGS[2]

I.    **Stipulated Facts**

On October 28, 2020, the parties filed their Joint Stipulation of Facts in Advance of

Preliminary Injunction Evidentiary Hearing (DE# 66, 10/28/2020) and stipulated to the following

facts:

The plaintiff, International Markets Live, Inc. d/b/a iMarketslive ("IML") is a software

and educational platform company.  IML sales organization relies on Independent Business

Owners ("IBOs" or "Affiliates"), who market and sell IML strategies and services and sponsor

new Affiliates.  IML Affiliates are independent contractors. Joint Stipulation ¶¶ 1-3.

The defendant, Scott Huss ("Mr. Huss") is a former IML IBO, who worked as an IML

IBO for approximately two and a half years. Mr. Huss's relationship with IML was terminated in

May 2020.  Joint Stipulation ¶¶ 4-5.

Although the parties do not stipulate to the admissibility of IML's Policies and

Procedures ("P&Ps") (Plaintiff's Ex. 1), the parties agree that the P&Ps contain the following

provisions:

Section 3.7(d) of IML's P&Ps provides:

However, an IBO may sell non-competing Services or services to the IML Customers and
IBOs that they personally sponsored.

Section 3.7(f) IML's P&Ps provides:

An IBO may not offer any non-IML opportunity, Services at any IML related meeting,
event seminar or conventions, or immediately following an IML event.

 Section 3.7(g) of IML's P&Ps provides:

---

[2] At the conclusion of the evidentiary hearing, the undersigned directed the parties to submit their respective
proposed findings of fact and conclusions of law. See, the plaintiff's [Proposed] Findings of Fact and Conclusions of
Law and Report and Recommendation (DE# 80-1, 11/12/20); see also, Defendant's Proposed Findings of Fact and
Conclusions of Law (DE# 78, 11/12/20).

A violation of any of the provisions of this section shall constitute unreasonable and unwarranted contractual interference between IML and its IBOs and would inflict irreparable harm on IML. In such event, IML may, at its sole discretion, impose any sanction it deems necessary and appropriate against such IBO or such IBO's positions including termination, or seek immediate injunctive relief without the necessity of posting a bond.

Section 12.2(a) of IML's P&Ps provides:

By agreeing to the IML IBO Agreement, the IBO acknowledges that business reports, lists of Customer and IBO names and contact information and any other information, which contain financial, technical or other information both written or otherwise circulated by IML or pertaining to the business of IML (collectively, "Reports"), are confidential and proprietary information and trade secrets belonging to IML.

Section 12.3(a)-(c) of IML's P&Ps provide:

(a) During the term of the IML IBO Agreement and for a period of one (1) year after the termination or expiration of the IBO Agreement between the IBO and IML, the IBO shall not; (b) Use the information in the Reports to compete with IML or for any purpose other than promoting his or her IML business; (c) Use or disclose to any person or entity any confidential information contained in the reports, including the replication of the genealogy in another network marketing company.

Section 12.4(a) of IML's P&Ps provides:

The IBO acknowledges that such proprietary information is of such character as to render it unique and that disclosure or use thereof in violation of this provision will result in irreparable damage to IML and to independent IML businesses. IML and its IBOs will be entitled to injunctive relief or to recover damages against any IBO who violates this provision in any action to enforce its rights under this action. The prevailing part shall be entitled to an award of lawyer's fees, court costs and expenses.

Section 12.5(a) of IML's P&Ps provisions:

Upon demand by IML, any current or former IBO will return the original and all copies of all "Reports" to IML together with any IML confidential information in such person's possession.

See Plaintiff's Ex. 1.

When an IML Affiliate sponsors another Affiliate or customer to join IML, that

sponsorship creates an organization of Affiliates or customers, which allows the sponsoring

Affiliate to receive compensation for the sales production of his or her downline Affiliates. This

structure is referred to as a "genealogy." Joint Stipulation ¶ 15.  An Affiliates compensation with IML is tied to, among other things, his or her location in IML's Affiliate network or genealogy and the location of other Affiliates in IML's Affiliate network or genealogy. Joint Stipulation ¶ 16.

Mr. Huss reached the rank of "Chairman 25" while he was at IML. Joint Stipulation ¶ 17. As an IML Affiliate Mr. Huss was compensated at least $200,000. Brown Decl. ¶ 14.  During his affiliation with IML, Mr. Huss had access to, and accessed, IML's web portal.  Mr. Huss had direct access with the IML system to see and possess the name, number, and email of any person that he sponsored at IML, regardless of whether than person was an Affiliate or customer.  Upon his suspension from IML, Mr. Huss could no longer access his own back office through the IML Portal.  During his time as an IBO affiliated with IML, Mr. Huss was part of several text message groups with other IML IBOs.  The participants in such text message groups used their personal phone numbers to participate and, as a result, every member of the group message chat had access to the other members' personal cell phone numbers.  Mr. Huss saved the cell phone information of certain individuals whom he sponsored to his personal cellular device and has used the contact information saved to his personal phone. Joint Stipulation ¶¶ 17-24.

Mr. Huss is currently affiliated with Well Beyond.  Since April 29, 2020, Mr. Huss has had contact with IML IBOs. Joint Stipulation ¶¶ 25-26.

## II.    Jason Brown

At the evidentiary hearing, Jason Brown testified that he is an IML IBO and the vice president of field operations, who is not an employee of IML. T. 20:12-14.  Mr. Brown described IML as "an online university." T. 55:1-2.  According to Mr. Brown, "[w]e like to, just classify education; but not just for cryptocurrency – Forex exchange which is a very large financial

market, if not the largest. Ecommerce, as well. So, we teach people skills. That is a place to come and learn skills from, you know, the comfort of your home, or which would clarify, anywhere around the world." T. 55:2-7.  IML is affiliated with between 40,000 and 50,000 IBOs. Pl.'s Ex. 26e, Brown Dep. 64:13-20. IML does not sign up any of its IBOs or their Customers. "The [IBOs] are the ones who build the compensation plan; correct, who market [IML]." T. 56:2-3.

Mr. Brown explained that every IBO signs a contract and agrees to comply with IML's P&Ps when they sign up and enroll as an IBO.  T. 21:18-22. IML updated its P&Ps in early 2019.  T. 21:23-25.  Mr. Brown testified that Section 1.4(a) of IML's P&Ps provides:

> Throughout these policies and procedures, when the term "Agreement" is used, it collectively refers to the online application, the electronic signature process, and the most current version of policies and procedures.

Pl.'s Ex. 1; T. 22:17-19.  The glossary of IML P&Ps collectively refers to "Agreement" as including "the IBO Agreement, the IML P&Ps and the IML Compensation Plan, all in their current form and as amended by IML in its sole discretion with the terms hereof." Pl.'s Ex. 1.

Mr. Brown testified that the Plaintiff's Exhibit 2 is a screen shot of a replicated back office that reflects the pop-up when the P&Ps were updated.  According to Mr. Brown, the individual was not able to proceed to the back office until they read, reviewed and agreed to the updated P&Ps.  T. 23:10-21. The pop-up window says nothing about the P&Ps being a binding contract, but the language is included in the 40-page, single spaced document. See Pl.'s Exs. 1 and 2.  Mr. Brown described a "genealogy" as being like a family tree where it sets out the line of enrollment.  IBOs cannot access the genealogies of other IBOs.  T. 24:24-25:7. Mr. Brown testified that IML keeps customer and IBO lists confidential to protect the work of the individual IBO. T. 25:8-16.  Mr. Brown explained that IML hosts invite-only private, confidential group chats for Chairmen 10 and Above and Chairmen 25 and Above. T. 26:5-25-27:25; 48:22-49:14.

Mr. Brown testified that the P&Ps provide the agreement between IML and the IBOs to keep information confidential and that the IML portal is password-protected. T. 28-29. An IBO can only see his own genealogy with the name, the ID number, phone number and email of the people he personally sponsored at IML.[3] T. 29:9-14, 74:1-8; see, e.g., Pl's Ex. 9. Mr. Brown stated that the P&Ps require IBOs to keep information from IML's Reports confidential. T. 30:11-31:4.

Mr. Brown testified about Mr. Huss contacting individuals outside his genealogy including Armando Valencia, Anthony Waseskuk, Jarred Austin, Christina Avila, and others. See Plaintiff's Ex. 7; T. 33-36. Mr. Brown explained that Mr. Huss spoke to others in John Legaretta's organization, which was upline to Mr. Huss, to recruit them and then recruit John Legaretta. T. p. 37, lns. 4-13. Mr. Brown testified that Anthony Waseskuk, who was one of Mr. Huss's top producers, lost hundreds of customers. T. 37:10-13. Mr. Brown stated that Mr. Huss's recruiting efforts hurt IML's reputation and planted seeds of fear of missing out on a great opportunity. T. 37-38. Mr. Brown agreed with the statements he made in his declaration that "IML's genealogy constitutes one of IML's most valuable assets and trade secrets that IML has prepared and owns and is not publicly available." See Brown Decl. ¶ 19, Pl.'s Ex. 21a; T. 64:15-65:7. Mr. Brown testified about the Plaintiff's Exhibit 9, which is a genealogy report. T. 67:5-19.

Mr. Brown explained that IML's trade secrets include lists that contain compilations of the identities of IML Affiliates, their status at IML, and the ranks they have achieved. T. 77:10-78:7; 82:8-83:7. Mr. Brown testified that IML does not contend that the individual and sometimes public rank of an IML Affiliate constitutes a trade secret. Instead, Mr. Brown

---

[3] In the genealogy, an IBO can go into the "contact" of the people he personally sponsors and see the name, phone number and email address. T. 70:8-15.

explained that IML's non-public lists containing compilations of Affiliates who have achieved certain ranks that it prepared, possesses and protects are IML's trade secrets.  T. 77:10-78:7; Brown Decl. ¶¶ 16-20 (Pl.'s Ex. 21a); Brown Depo. 105:11-20 (Pl.'s Ex. 26e).

### III.    Chris Hervey

At the evidentiary hearing, Chris Hervey, testified and stated that he is a programmer who works for Success Marketing Systems. T. 85:21-24. Mr. Hervey explained that Success Marketing Systems provides the software that runs IML's website, which takes IML's orders and calculates their commissions in IML's back office.  T. 86:11-14.  According to Mr. Hervey, the back office is where users log in to see the activity in their account.  T. 86:15-16. Mr. Hervey testified that he either facilitated the creation of or created the IML Pop-up regarding the updated P&Ps, the screen shot of which is the Plaintiff's Exhibit 2.  T. 86:18-87:5.  Mr. Hervey explained that the upper right-hand corner has a little gray box that allows the user to scroll the document and that the bottom contains a blue authorization that says, "I Agree."  T. 87:6-10.  Mr. Hervey testified that when the "I Agree" button is clicked, it sends a trigger to record in the database an ID of the user, the IP address, the time and particular pop-up that was clicked, so that a record is created and they do not show the pop-up again.  T. 87:12-20.

Mr. Hervey testified that Mr. Huss's User ID 992894 clicked the "I Agree" button on the pop-up regarding IML's updated P&Ps on April 7, 2019. T. 89:12-92:13; Plaintiff's Ex. 2, IML Pop-up regarding updated P&Ps; and Plaintiff's Ex. 28, Email from Chris Hervey to Chris Abdey.  The pop-up states, "Our Policies & Procedures have changed" and "Please take a moment to review our new Policies and Procedures, then click the 'I Agree' button."  Plaintiff's Exhibit 2.

## IV.     Scott Huss

Mr. Huss testified at the evidentiary hearing.  Additionally, volumes I and II of the transcripts of Mr. Huss's deposition were admitted as Plaintiff's Exhibits 26a and 26b. The defendant filed the Declaration of Scott Huss ("Huss Decl.") (DE# 44-1, 9/16/20) in support of the Defendant's Memorandum of Law in Opposition to Plaintiff's Expedited Motion for Preliminary Injunction (DE# 44, 9/16/20).  The testimony Mr. Huss gave at the evidentiary hearing contradicted his own prior deposition testimony, his declaration, the testimony of other witnesses and documentary evidence.  The undersigned finds that Mr. Huss's testimony lacked credibility.

According to his declaration, Mr. Huss became an IBO with IML on October 4, 2017. Huss Decl. ¶ 2 (DE# 44-1, 9/16/20).  Huss was not an IML employee and did not have an employment agreement with IML.  Id. at ¶ 3. Huss rose to the rank of Chairman 25 at IML by December 2018.  Id. at ¶ 4.  Huss sponsored over ninety (90) other IBOs and customers. Id. at ¶ 6.  Connor Scott, Scottie Rapp, and Daniel Wilkins were part of Huss' team at IML. Id. at ¶ 9. Huss worked as an IBO until he was suspended on April 29, 2020 and terminated on May 1, 2020. Id. at ¶ 5. Upon leaving IML, Mr. Huss immediately lost access to his back office and the IML group chats in which he was a participant. T. 134:15-135:8, 151:15-19.  On May 13, 2020, Mr. Huss joined Well Beyond as an independent contractor who markets and sells nutrition products and crypto-currency educational products. Huss Decl. ¶ 30; T. 147:6. According to Mr. Huss, Well Beyond's products are focused on "nutrition, health, wellness, mood enhancers." T. 146:7-17.  IML does not offer similar products. T. 147:5-7; T. 199:11-13. Mr. Huss does not sell and Well Beyond does not offer any "forex" or "equities" or futures educational or service products.  Id. Well Beyond did not have any trading products available at the time of the hearing.

T. 146:18-19.  While Well Beyond does have a crypto currency wallet called Coin Zoom, it does not have "Forex or trading development" products. T. 146:25-147:2.

At the evidentiary hearing, Mr. Huss provided conflicting testimony to his prior statements in his declaration and his deposition. Mr. Huss claimed that he did not remember whether he clicked a box agreeing to IML's P&Ps. T. 96:8-25.  Mr. Huss testified that he signed up with IML as a customer and later as an IBO.  T. 97:1-8.  Despite admitting that he worked as an IML IBO for two and a half years, Mr. Huss stated that he never had an agreement with IML. T. 97:6-11.

Mr. Huss testified that he knew the compensation and rank structures of IML and that he would be paid for sponsoring people to IML. T. 97:23-98:15.   At the evidentiary hearing, Mr. Huss denied that he knew IML had rules that governed IML IBOs.  T. 98:20-25.  Mr. Huss's Declaration contained statements regarding IML rules and was admitted as the Plaintiff's Exhibit 33.  T. 100: 6-25.  When asked about paragraph 16 in the Huss Declaration (Pl.'s Ex. 33), Mr. Huss explained that he did not know that a specific IML rule prohibited him from joining another company and then sending information towards the other company.  T. 101:4-102:1. When shown his deposition transcript, Mr. Huss admitted that he knew there was a rule against him doing that and regarding joining another company and soliciting that company to IML members. T. 102:2-103:6; 104:1-105:11; see Huss Depo. 69:18-23 (Pl.'s Ex. 26a).

At the evidentiary hearing, Mr. Huss repeatedly testified that he has not recruited anyone to leave IML whom he did not personally sponsor, which is false. See Huss Decl. ¶¶ 17-21; cf. T. 249:2-5; FOF ¶ 69.  Mr. Huss attempted to recruit IML Affiliates that he did not sponsor at IML and has used IML trade secrets and confidential information to support his recruitment efforts.  The plaintiff's Exhibit 9 contains a series of text messages from Mr. Huss to Marian

Lantigua and Alexander Abdallah, dated June 8, 2020, in which Mr. Huss attempts to recruit Ms. Lantigua and Mr. Abdallah to join Well Beyond by sending them images of "Placement Tree" genealogy information, including customer and Affiliate lists, captured from IML's web portal and instructing them to "Call me when ur ready." Pl.'s Ex. 9; T. 67:9-19 (Brown Testimony); T. 137:5-142:18 (Huss Testimony).  Mr. Huss admitted that they "are screenshots I had of my back office," which he confirmed remained in his possession "long after" he claims "not to have had any information IML's genealogy or structure or other proprietary information." T. 136:10-137:4; 140:4-141:22 (Huss Testimony).

At the evidentiary, Mr. Huss repeatedly denied that he ever saw the pop-up "I Agree" window of the updated P&Ps. T. 113:2-114:10; 115:5-17; 116:2-117:3. Mr. Huss verified that 992894 is his account at IML and did not dispute Mr. Hervey's testimony that the "I Agree" button for Mr. Huss's account was clicked on April 7, 2019.  Instead, Mr. Huss testified that he did not recall pressing the "I Agree" button or seeing the information regarding the updated P&Ps on the screen.  T. 116:2-18. Mr. Huss explained that he did not agree to the updated P&Ps and that nobody explained the P&Ps to him and he did not understand the P&Ps.  T. 116:23-117:1-3.  Mr. Huss testified that while he was at IML, he logged into other people's back offices with the credentials they gave him. T. 135:11-136:12. Mr. Huss testified that his back office access was terminated by IML the same day he notified Julie Kirshner in April 2020. T. 117:12-25. Mr. Huss explained that he still has screen shots of his IML back office on his phone. T. 136:10-137:4. When Mr. Huss left IML, IML removed him from all the group chats and he no longer had access to IML group chats. T. 151:15-19.

Before Mr. Huss joined Well Beyond, he considered joining Melius and shared information with other IML Affiliates, including those he did not sponsor at IML, and required

them to sign a non-disclosure agreement ("NDA"). T. 118:7-119:4. Christina Avila, who Mr. Huss did not sponsor at IML, was one IML IBO that Mr. Huss spoke with about his plans to join Melius and asked her to sign an NDA.  T. 119:21-124:18; Pl.'s Ex. 3 (text messages between Mr. Huss and Ms. Avila). Mr. Huss denied "recruiting" Ms. Avila to join another company.  T. 122:15-25.  Mr. Huss explained that "[r]ecruiting, to [him], means signing [Ms. Avila] up into another company." T. 122:20-25.  Mr. Huss affirmed his verified supplemental answer to interrogatory number four which states "Mr. Huss did not knowingly recruit any former IML affiliate or customer to join Well Beyond." T.126:12-127:3; Pl.'s Ex. 24-8 (Defendant, Scott Huss's, Supplemental Objections and Answers to Plaintiff, International Market's Live, Inc.'s First Set of Interrogatories).

At the evidentiary hearing, Mr. Huss testified that he met the founders of Well Beyond in Utah in May 2020. T. 124:21-23.  Mr. Huss joined Well Beyond on May 14, 2020 and generated a million in volume in less than 90 days.  T. 125:21-25.  Mr. Huss confirmed that approximately 4,286 people were in his tree at Well Beyond less than six months after IML terminated him.  T. 125:23-126:8.

Mr. Huss also testified at the evidentiary hearing that he did not recruit Jarred Austin, who was an IML IBO, despite acknowledging that he sent information regarding Melius and a Well Beyond video to Mr. Austin.  T. 127:9-128:17; Pl.'s Ex. 31-1 (text message to Mr. Huss to Richard Mille, Jarred, IM P600).  Mr. Huss stated that he knew Connor Scott, who was one of Scotty Rapp's people, who was downline from Jarred Austin.  T. 130:15-131:1-3.  Although Mr. Huss denied recruiting Mr. Scott to Well Beyond, Mr. Huss testified that he paid for Mr. Scott's airline ticket to fly to Utah to meet with the founder of Well Beyond. T. 131:4-15.

At the evidentiary hearing, Mr. Huss testified that Ricky Barroso is one of his best friends who he had on his team at IML and he sponsored at Well Beyond. T. 132:1-12.  Mr. Huss testified that he never set up a contract to pay John Legaretta $40,000 for three months at Well Beyond.  T. 134:8-12; see Pl.'s Ex. 16 (text message from Mr. Barroso to John Legaretta).  The Plaintiff's Exhibit 16 is a text message from Mr. Barroso to Mr. Legaretta that states in part, "I have no bad intentions at all, Scotty told me to let you know he wants you part of his team in beyond & he'll set up a contract to pay you $40k for 3 months…."  Pl.'s Ex. 16.

Mr. Huss was shown the Plaintiff's Exhibit 9-1, a screen shot from Marian Lantigua's telephone of a group text message on June 8, 2020 between Mr. Huss, Marian Lantigua and Alex Abda that reflects a photo of Mr. Huss's genealogy at IML and Mr. Huss's statement, "Call me when ur ready I love you guys dearly." Pl.'s Ex. 9-1; T. 137:5-140:10.  Mr. Huss denied sending the pictures of Mr. Huss's genealogy to Ms. Lantigua and Mr. Abda to try to get them to join Well Beyond.  T. 141:1-9.

IML presented four text messages between Mr. Huss and individuals affiliated with IML in which Mr. Huss mentioned Well Beyond. Pl.'s Exs. 17, 18, 30 and 31.  Mr. Huss characterizes most of the texts as sending a non-personalized, general link to information about Well Beyond. Huss Depo. 113:1-117:7, Pl.'s Ex. 26a. In his deposition, Mr. Huss explains that the person who received the Well Beyond link to a promotional video does not link with the person's sponsor until they purchase a package and complete their personal information. Id.  At the evidentiary hearing, Mr. Huss testified that "[he] did not instruct anybody" independently contracted with Well Beyond to make any offers or communication to any individual who is affiliated with or a customer of IML. T. 131:16-21; Huss Decl. ¶38, Huss Depo. 86:17-87:20.

**V.**    **Marian Lantigua**

At the evidentiary hearing, Marian Lantigua testified that she is an IML IBO who started in September 2018. Ms. Lantigua knew Mr. Huss as the sponsor of one of the people who sponsored her, that is, Mr. Huss was Ms. Lantigua's "up line." T. 158:2-25. Ms. Lantigua testified that the Plaintiff's Exhibit 9 is a copy of a three-way text message from Mr. Huss to Alexander Abda and Ms. Lantigua, which contained a screen shot of the back office that reflected Ms. Lantigua's rank as platinum 2000. Ms. Lantigua testified that the screen shot appears to be the log-in of a back office of Maury Sardinas, who was a former leader and was one of her up lines. T. 163:1-25. Ms. Lantigua did not respond to Mr. Huss's text and blocked Mr. Huss in e-messages and social media. T. 165:1-13.

Ms. Lantigua testified that the Plaintiff's Exhibit 15 is a July 9, 2020 text message showing screen shots of the commissions at Well Beyond from a former leader, Keenan Fleming. T. 165:14-23-166:5-7, 13-25. Ms. Lantigua explained that the text messages in Exhibit 15 that "[y]ou should come to Utah with Me and Scotty to Meet the Owners…" revealed that Mr. Fleming wanted her to join Well Beyond and work for them. T. 167:1-17. Ms. Lantigua did not speak with Mr. Huss since he left IML. T. 168:13-15. Ms. Lantigua testified that there was nothing wrong with Mr. Fleming going to Well Beyond because Mr. Huss sponsored him at IML. T. 172:1-4. Ms. Lantigua explained that her rank went up from platinum 2000 to platinum 5000 after Mr. Huss left and then it went back down to platinum 2000 because multiple leaders in her down line were recruited to Well Beyond by Mr. Huss. T. 172: 18-25-173:1-6. Ms. Lantigua stated that Mr. Huss did not personally recruit her down line leaders, including Edwin Bottex or CJ Harrison, to IML. T. 173:10-15.

## VI.    Jarred Austin

At the evidentiary hearing, Jarred Austin testified that he is an IML IBO since December 2018, who Mr. Huss sponsored. T. 177:15-23; 193:1-3; 195:22-25.  Mr. Austin explained the process for becoming an IML IBO, which included opening a referral link he received via text message on his cell phone, filling out basic information (name, phone number and email address), and creating a username and password for the platform. T. 178:1-6.  Mr. Austin paid for the platform, entered his credit card information, and then was prompted to read IML's P&Ps.  Mr. Austin read the P&Ps and then agreed that he read them by checking the box "I agree."  T. 178:6-13.  Mr. Austin testified that he could not have enrolled as an IML IBO without agreeing to the P&Ps.  T. 178:14-16.  Mr. Austin stated that he agreed to the updated P&Ps in March or April 2019. T. 178:17-23. Mr. Austin explained that when he accessed his account, he was prompted with a box and it had updated P&Ps that he read and checked that he agreed that he read them.  T. 178:21-179:7.

Mr. Austin testified that Mr. Huss attempted to recruit him multiple times.  T. 181:24-182:1. At his home office, Mr. Huss had Mr. Austin sign an NDA before Mr. Huss pitched Melius to Mr. Austin. T. 182:2-183:9. Mr. Huss also tried telephonically to recruit Mr. Austin to Well Beyond by offering Mr. Austin the top spot as well as an additional $5,000 on top of whatever Mr. Austin earned himself.  T. 184:3-15.  Additionally, Mr. Huss sent Mr. Austin a text message offering him a top spot at Well Beyond. Pl.'s Ex. 5; T. 184:12-25. Mr. Austin testified that Mr. Huss planned to recruit other people from IML.  T. 185:4-20. Mr. Austin explained that Mr. Huss's plans to recruit other people made him uncomfortable because cross-recruiting is a frowned-upon practice. T. 185:18-186:6.   Mr. Austin testified that cross-recruiting damages the livelihoods of other individuals. T. 186:1-6.

When Mr. Austin refused Mr. Huss's offer to leave IML, Mr. Huss threatened via text message to target Mr. Austin's genealogy. T. 186:10-25.  The Plaintiff's Exhibit 8 is the text message wherein Mr. Huss texted that he was "[c]oming after your check … I helped you keep a majority of your check." T. 187:1-9; Pl.'s Ex. 8.  Mr. Huss also texted, "[i]f that's the game you wanna play or say sh** one more time I'll really f***ing run it." T. 187:9-11; Pl.'s Ex. 8. Mr. Austin explained that he knew Mr. Huss was going after people in Mr. Austin's organization and he asked Mr. Huss to stop.  T. 187:15-17.  Mr. Austin testified that Mr. Huss immediately targeted the top leaders in Mr. Austin's organization including Scott Rapp, Connor Scott and Daniel Wilkins, who were not sponsored to IML by Mr. Huss. T. 188:8-189:3.   Mr. Austin met Mr. Rapp in Albany, New York. T. 189:4-11.  Messrs. Rapp, Scott and Wilkins flew to Utah together to meet the founders of Well Beyond with Mr. Huss. T. 189:12-25.  Mr. Austin testified that Messrs. Rapp, Scott and Wilkins also made great efforts to recruit people out from underneath him.  T. 190:2-12.  Before May 2020, Mr. Austin explained that he had approximately 730 people in his organization.  T. 190:23-25.  After the recruitment to Well Beyond, Mr. Austin testified that he has between 120 and 150 people in his organization. T. 191:1-2. Mr. Austin's income dropped from $7,000 to $1,000 per month, an eighty-five percent (85%) decrease. T. 191:5-14. Mr. Austin testified that he could calculate a monetary estimate of what Mr. Huss's actions cost him. T: 208:5-10. Mr. Austin testified that he built his organization back up to 500 people and that he would have significantly more than 500 people if Mr. Huss had not recruited from Mr. Austin's organization. T. 209:7-18.  Mr. Austin explained that the people who participated in an organization's group chat had access to the name and contact information of any individual in the group chat. T. 211:20-212:23.   Mr. Austin further explained that when someone sends a message in the group chat, it messages everyone.  T. 212:11-16.

## VII.    Christopher Abdey[4]

Christopher Abdey did not testify at the evidentiary hearing.  In his declaration, Mr. Abdey states that he is employed by IML as the Trust and Safety Manager. Abdey Decl. ¶ 2; Pl.'s Ex. 21e.  In his declaration, Mr. Abdey avers that on October 22, 2020, Chris Hervey of Network Marketing Solutions sent him an email in response to Mr. Abdey's request for a record of when User 992894 clicked the "I Agree" button on the pop-up box containing the updated P&Ps as shown in the Plaintiff's Exhibit 2.  The Plaintiff's Exhibit 28 is a true and correct copy of the Mr. Hervey's email to Mr. Abdey and confirms that Mr. Huss clicked the "I Agree" button on the pop-up box that contained IML's updated P&Ps on April 7, 2019 at 12:37:23 Eastern time. Abdey Decl. ¶¶ 8-11.

## STANDARD OF REVIEW

### I.    Jurisdiction

The Court has diversity jurisdiction over the plaintiff's breach of contract claim and federal jurisdiction over the plaintiff's claim based on the violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("DTSA").

#### A.  Florida's Choice-of-Law Rules Apply and New York Law Governs the Plaintiff's Breach of Contract Claim

The plaintiff has consistently maintained that New York law governs the plaintiff's breach of contract claim because IML's P&Ps contain a choice-of-law provision that states New York law applies.  See Complaint ¶¶ 1, 38, 45, 52 and 58; see also P&Ps § 8.7. (Section 8.7 Governing Law provides in pertinent part: "The law of the State of New York shall govern all matters relating to or arising from the Agreement or between IML and IBO.").  In his initial

---

[4] In the Defendant's Proposed Findings of Fact and Conclusions of Law, Mr. Huss includes statements purportedly made by Mr. Abdey in his deposition and references a deposition transcript that has not been filed with the Court. The undersigned has not included facts that are not part of the record.

response, Mr. Huss disputed that New York law governs IML's breach of contract claim. Response at 7 n.4 (DE# 44, 9/16/20). At the evidentiary hearing and in his supplemental memorandum, Mr. Huss now agrees that New York law applies to the contract claim. See Defendant's Supplemental Memorandum of Law in Opposition to Plaintiff's Expedited Motion for Preliminary Injunction at 1 n.1 (DE# 71, 11/5/20); and Defendant's Proposed Findings of Fact and Conclusions of Law at p. 14 n.1 (DE# 78, 1/12/20).

The undersigned finds that New York law governs the contract claim because the parties' agreement contains a choice-of-law provision that does not contravene Florida's public policy. See, MDS (Canada), Inc. v. Rad Source Techs., 822 F. Supp. 2d 1263, 1295 (S.D. Fla. 2011) ("Under Florida's choice-of-law rules, courts should respect a choice-of-law provision within a contract, unless the chosen law contravenes Florida public policy."); see also, Brown Decl., Ex. A., P&Ps §8.7. Accordingly, the undersigned will apply New York law to the analysis of IML's breach of contract claim.

### B.  The Court Has Federal Jurisdiction over IML's Trade Secret Claim

IML's misappropriation of trade secrets claim is based on alleged violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1), *et seq*., ("DTSA").  Accordingly, the undersigned will apply federal law to IML's misappropriation of trade secrets claim.

### II.    Preliminary Injunction

A preliminary injunction may be granted only if the moving party establishes four factors: (1) a substantial likelihood of success on the merits; (2) an immediate irreparable injury absent injunctive relief; (3) a threatened harm to the plaintiff that outweighs any injury the

injunction would cause to the nonmovant; and (4) the injunction will not disserve the public interest. General Mills, Inc. v. Chobani, LLC, 158 F. Supp. 3d 106, 115 (N.D.N.Y. 2016).[5]

"A preliminary injunction is an extraordinary remedy never awarded as of right." Id. (quoting Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted)).  The burden of persuasion is on the party seeking the injunction to make a clear showing that the four requirements are met. Id. (citation omitted). A party is "not required to prove [its] case in full at a preliminary injunction stage," and "all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true."  Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc., 2020 WL 3078531, at *9 (S.D. Fla. June 10, 2020) (citing Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976) (internal quotations omitted)).  Additionally, a court may consider the credibility of witnesses and is not required to resolve any disputed issues of fact in a light most favorable to the non-moving party on a motion for preliminary injunction. See Imaging Business Machines., LLC v. BancTec, Inc., 459 F.3d 1186, 1192 (11th Cir. 2006).

### III.    Injunction Bond

The Court has discretion to require the movant to post and to set the amount of an injunction bond. See, Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction … only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained…."); see Tracfone Wireless, Inc. v. Washington, 978 F. Supp. 2d 1225,  1235 (M.D. Fla. 2013) (not requiring a bond

---

[5] The Eleventh Circuit applies the same four requirements. Bellsouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 968 (11th Cir. 2015); Carillon Imps v. Frank Pesce Int'l Group Ltd., 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted); United Teachers of Dade v. Stierheim, 213 F. Supp. 2d 1368 (S.D. Fla. 2002) (Ungaro, J.).

where the court "determined that [the plaintiff] ha[d] a high probability of succeeding on the merits of its … claims, and because [the] [d]efendants ha[d] no legitimate interest in the continued use of [the plaintiff's] [t]rademarks"); <u>see also</u> <u>Harris v. Hous. Auth. of City of Daytona Beach</u>, 2001 WL 36404273, at *5 (M.D. Fla. April 25, 2001) (not requiring bond where the preliminary injunction would result in minimal potential harm to the defendant).  Section 3.7(g) of IML's P&Ps contains a bond waiver provision and states in pertinent part that IML may "seek immediate injunctive relief without the necessity of posting a bond" as a sanction of violations of IML's P&Ps that constitute interference with the contractual relations between IML and its IBOs. P&Ps § 3.7(g). The undersigned recommends that the Court exercise its discretion and not require IML to post a bond where, as here, IML has shown a substantial likelihood of success on the merits and the imposition of a preliminary injunction will not preclude Mr. Huss from continuing to earn a living at Well Beyond without violating IML's restrictive covenants.

## <u>ANALYSIS</u>

The plaintiff seeks a preliminary injunction to prohibit the defendant from "using the trade secrets he stole for any purpose, including to poach IML affiliates and customers" in breach of the parties' Independent Business Owner Agreement ("IBO Agreement").  Motion at 11; see proposed Order Granting Plaintiff's Expedited Motion for Preliminary Injunction, Ex. 7 (DE# 37-7, 9/8/20) (SEALED); <u>see</u> Response at 7-8 (DE# 44, 9/16/20) (Huss acknowledges that IML and he had an "Independent Business Owners Agreement.") (citing Huss Decl., Ex. 1, at ¶ 3 (DE# 44-1, 9/16/20)).

## I.     Injunctive Relief

### A.   Substantial Likelihood of Success on the Merits

The first factor, the substantial likelihood of success on the merits, requires an analysis of the plaintiff's ability to make a showing of each of the required elements of the claims asserted. See Seiko Kubushiki Kaisha v. Swiss Watch Int'l, Inc., 188 F. Supp. 2d 1350, 1353-55 (S.D. Fla. 2002.  In the present case, the plaintiff seeks a preliminary injunction as to two of its four claims[6]: breach of contract and misappropriation of trade secrets in violation of the Defend Trade Secrets Act (28 U.S.C. § 1836, *et seq.*).  IML argues that it is very likely that IML will prove that Mr.  Huss breached his contractual duties and misappropriated and used IML's trade secrets, including IML's affiliate and customer lists.  The defendant has attacked the merits of both claims.  The undersigned finds that IML has shown a substantial likelihood of success on the merits of both claims.  The undersigned recommends that this Court grant IML's motion for preliminary injunction to enjoin Mr. Huss's conduct that violates his IBO Agreement as well as the DTSA.

#### 1.   Breach of Contract Claim

To prove breach of contract under New York law, IML must prove: (1) a valid and enforceable contract; (2) IML's performance of the contract; (3) breach by Mr. Huss; and (4) damages.  United States Nonwovens Corp. v. Pack Line Corp. 48 Misc. 3d 211, 215, 4 N.Y.S.3d 868, 872 (N.Y. Sup.  Ct. 2015).  IML claims that Mr. Huss breached the non-solicitation and confidentiality obligations contained in the P&Ps.  Based on the evidence, IML has established a substantial likelihood of success on the merits on its breach of contract claim.

##### (i)     IML Has Shown the Formation of a Valid Contract

---

[6] The plaintiff does not seek injunctive relief on its third, fourth and fifth claims, tortious inference with contractual relations, tortious interference with economic advantage and unfair competition, respectively.

IML's P&Ps constitute a contract between IML and Mr. Huss. "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Kai Peng v. Uber Techs., Inc., 237 F. Supp. 3d 36, 47 (E.D.N.Y. 2017).

In Section 4.2 of IML's P&Ps, IML made a clear offer to Mr. Huss to become an IBO and offered him: "a non-exclusive right, based upon terms and conditions contained in the Agreement to: (i) Purchase IML Services; (ii) Promote and sell IML Services; and (iii) Sponsor new IBOs and Customers in countries where IML is currently authorized to do business or becomes authorized to [do] business in the future." Pl.'s Ex. 1, P&Ps § 4.2.

Mr. Huss accepted IML's offer. Mr. Huss electronically checked a box accepting the terms of the P&Ps that were presented to him electronically on or about October 2017 as a condition of becoming an IML Affiliate. Brown Decl. ¶¶ 7-8, 12; T. 47:6-10; T. 178:14-16. When IML updated its P&Ps in April 2019, Mr. Huss clicked the "I Agree" button. Pl.'s Ex. 2, 21e and 28; T.  87-88, 89-92. Under New York law, "[i]n the context of agreements made over the internet … [a] party may be bound to a 'click-wrap' agreement … by clicking a button declaring assent, so long as the party is given a 'sufficient opportunity to read the … agreement, and assents thereto after being provided with an unambiguous method of accepting or declining the offer,'" and clicking "I agree" is sufficient. Kai Peng v. Uber Technologies, Inc., 237 F. Supp. 3d 36, 47-48 (E.D.N.Y. 2017) (quoting Serrano v. Cablevision Sys. Corp. 863 F. Supp. 2d 157, 164 (E.D.N.Y.  2012) (other citations omitted)). In Kai Peng, the court explained that "courts in this Circuit [applying New York law] have upheld 'Sign-In Wrap' agreements where plaintiffs did not even click an 'I Accept' button, but instead clicked a 'Sign Up' or Sign In' button." Id. at 47.  "Clickwrap agreements necessitate an active role of the user of a website. Courts, in general, find them enforceable." Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 397

(E.D.N.Y. 2015) (citing <u>Drew</u>, 259 F.R.D. at 462, n.22). "'Clickwrap agreements require a user to affirmatively click a box on the website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website.'" <u>Id</u>. (citing <u>United States v. Drew</u>, 259 F.R.D. 449, 462, n.22 (C.D. Cal. 2009)). "By requiring a physical manifestation of assent a user is said to be put on inquiry notice of the terms assented to." <u>Id</u>.

Mr. Huss's testimony that he though the "I Agree" button merely sought his opinion about whether IML had changed the terms of the P&Ps is not credible. Supplemental Response p. 3-4. New York law does not require that all of a contract's terms be presented to a user on a single page. <u>See</u>, <u>Berkson</u>, 97. F. Supp. 3d at 398 (citing <u>Feldman v. Google</u>, 513 F. Supp. 2d 229, 236-38 (E.D. P. 2007) (The "plaintiff had the duty to read terms that were presented in a scroll box and required a click to agree and, therefore, the fact that the entire contract was not visible in the scroll box was irrelevant.")); <u>Bar-Ayal v. Time Warner Cable Inc.</u>, 2006 WL 2990032, at *9 (S.D.N.Y. Oct. 16, 2006) (finding contract formed where scrolling through thirty-eight screens of text required). In <u>Berkson</u>, the court acknowledged that "[e]xperts in commercial practice have recommended as best practices for businesses that they ensure internet users have a realistic opportunity to read the 'terms of use' on a business's website." <u>Berkson</u>, 97 F. Supp. 3d at 386. In the present case, the updated P&Ps constitute a "scrollwrap" agreement that afforded Mr. Huss a "realistic opportunity to review and scroll through the electronic agreement." <u>Id</u>. The evidence shows that Mr. Huss clicked the "I Agree" button in April 2019, which manifested his assent to be bound by the updated P&Ps. <u>Kai Peng</u>, 237 F. Supp. 3d at 47; <u>Berkson</u>, 97 F. Supp. 3d at 398.

Mr. Huss's argument that the P&Ps cannot create an enforceable contract because "they cannot modify an employment agreement" lacks merit.  Mr. Huss's position and the case law upon which he relies fails to recognize that the P&Ps are included in the Agreement that governs Mr. Huss's relationship with IML as an IML IBO.  See, Ex. 1 §§ 1.4, 2.3.  Under New York law, "a contract is formed when all of the contracting parties express an intent to be bound and where all of the essential terms of the agreement have been spelled out." International Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 593 (2d Cir. 1996); see, Talk Fusion Inc. v. Ulrich, 2011 WL 2681677, at *9 (M.D. Fla. June 21, 2011) (granting injunction that enforced direct marketing business's "Statement of Policies and Procedures" against former associate); see also, PartyLite Fifts, Inc. v. MacMillan, 895 F. Supp. 2d 1213, 1231 n.24 (M.D. Fla. 2012) ("Policies and Procedures themselves may … form the basis of an express or implied contract.").  Mr. Huss's argument that restrictive covenants are unenforceable against independent contractors also lacks merit. See Response at 7-8 (DE# 44).  Under New York law, restrictive covenants are enforceable against independent contractors.  See Windshield Installation Network v. Goudreau, 654 N.Y.S.2d 442, 443 (App. Div. 1997) (enforcing non-compete agreement against independent contractor); Devos, Ltd. v. Record, No. 15-cv-6916(ADS)(AYS), 2015 WL 9593616, at *18 (E.D.N.Y. Dec. 24, 2015).  (granting preliminary injunction against independent contractor).  Likewise, Mr. Huss's additional arguments that he did not have an opportunity to negotiate the terms of the P&Ps or that he did not read, did not understand and no one at IML explained the P&Ps to him are also without merit.  See Saizhuang Guan v. Uber Technologies, Inc., 236 F. Supp. 3d 711, 724-725 (E.D.N.Y. 2017) (explaining that the law is well established that failure to read a contract is not a defense to contract formation "even when the failure to read the contract is attributable to the party's inability to read or understand the language in which the

contract is written"); <u>Ragone v. Atl Video at Manhattan Ctr.</u>, 595 F.3d 115, 122 (2d Cir. 2010)

(explaining that "New York courts have repeatedly ruled that even the fact that a prospective

employee possesses an imperfect grasp of the English language will not relieve the employee of

making a reasonable effort to have the document explained to him"). Section 1.5(c) of the P&Ps

notifies IML Affiliates that if they "have any questions regarding a policy, rule or guidelines, the

IBO is encouraged to seek an answer form the company FAQ, found on the website, their

personal Sponsor, or the IML Customer Service Team by submitting an email to:

<u>support@imarketslive.com</u>." Ex. 1 at § 1.5c.

The undersigned granted Mr. Huss's request to take judicial notice of an order denying a

motion to compel arbitration in *Duncan v. International Markets Live, Inc.*, No. 4:20-cv-00017-

RGE-HCA (S.D. Iowa 2020). The *Duncan* decision is factually distinguishable and not binding

on this Court.  In *Duncan*, the district court denied a motion to compel arbitration based on

IML's P&Ps because IML failed to present adequate evidence that the plaintiff clicked the box

agreeing to the P&Ps and determined that even if the plaintiff did, the updated P&Ps did not

contain an arbitration provision.  Unlike *Duncan*, IML has established that Mr. Huss clicked the

"I Agree" button regarding the updated P&Ps which IML seeks to enforce with a preliminary

injunction.

(ii)    <u>IML Has Performed</u>

IML performed under the Agreement by training Mr. Huss, making IML's strategies and

services available for Mr. Huss to sell, and equipped Mr. Huss with IML's trade secrets and

proprietary tools and information to help him build his organization with IML.  IML also

afforded Mr. Huss with the rights described in Section 4.2 of the P&Ps and paid Mr. Huss

hundreds of thousands of dollars. P&Ps § 4.2; Joint Stipulation ¶ 17; Brown Decl. ¶ 14.

Mr. Huss argues that on "May 1, 2020, IML refused to pay Mr. Huss the commission he was owed, thereby terminating their agreement." Response at 3 (DE# 44).  Section 7.3 of the P&Ps permits IML to withhold commission payments from IBOs for breaching the P&Ps "until the matter causing the Commission Hold is resolved or until IML received adequate additional assurances from IBO to ensure future compliance." Pl.'s Ex. 1, P&P's § 7.3. IML maintains that because the issues in this case have not been resolved, IML's alleged withholding is not a breach of the P&Ps.  In the Defendant's Proposed Findings of Fact and Conclusions of Law, Mr. Huss argues for the first time that IML waived its right to enforce the contract "because [IML] did nothing to prevent internal cross-recruiting that caused Mr. Huss's monthly salary to drop from $25,000 per month to $10,000 per month" even though IML's P&Ps prohibit cross-recruiting. (DE# 78, 11/12/20).  Mr. Huss's reliance on Horne v. Radiological Health Services, P.C., 371 N.Y.S.2d 948, 961 (19175) to support his waiver argument is misplaced.  Horne is factually distinguishable and did not find waiver under the particular facts of the case. The undersigned finds that IML performed under the P&Ps and did not waive its rights to enforce the restrictive covenants in the P&Ps.

(iii)     The P&Ps Restrictive Covenants Are Reasonable and Enforceable

IML argues that the limited restrictions and 6-months-post-termination duration in Section 3.7(a) of IML's P&Ps are reasonable under New York law. Under New York law "'a restrictive covenant will only be subject to specific enforcement to the extent that it is [(1)] reasonable in time and area, [(2)] necessary to protect the employer's legitimate interests, [(3)] not harmful to the general public and not unreasonably burdensome to the employee.'" BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 389 (1999) (quoting Reed, Roberts Assocs. v. Strauman 40 N.Y.2d 303, 307 (1976)).

Section 3.7(a) of the P&Ps contains the subject non-compete provision and provides in pertinent part:

> [D]uring the term of this Agreement and for six (6) months thereafter, an IBO may not sponsor/recruit any fellow IML IBO or Customer for any other direct sales or network marketing business, unless that fellow IBO or Customer was personally sponsored by such IBO.

Pl.'s Ex. 1, P&Ps § 3.7(a).   Section 3.7(b) of the P&Ps defines "sponsor/recruit" as follows:

> The terms "sponsor/recruit" means actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way (either directly or through a third party), another IBO or Customer to enroll or participate in any direct sales or network marketing opportunity.  This conduct represents recruiting even if the IBO's actions are in response to an inquiry made by another IBO or Customer.

Pl.'s Ex. 1, P&Ps § 3.7(b).

IML relies on Mercer Health & Benefits LLC v. Digregorio, 307 F. Supp. 3d 326, 349 (S.D.N.Y. 2018), which found the one-year limitation in an anti-solicitation provision "a very reasonable time limitation."   IML's non-solicitation provision only prohibits solicitation of Affiliates and customers that the IBO did not personally sponsor and were sponsored by other IML Affiliates.  The undersigned finds that IML's six-month non-solicitation provision is reasonable under New York law. Digregorio, 307 F. Supp. 3d at 349; see Ecolab, Inc. v. K.P. Laundry Machinery, Inc., 656 F. Supp. 894, 898 (S.D.N.Y. 1987) (finding the one-year restrictive covenant enforceable under New York law where the "plaintiff … made a strong showing that the covenants are 'necessary to protect the trade secrets, customer lists [and] good will of [Ecolab's] business,' and that they are reasonable in time, space [and] scope") (quoting American Broadcasting Cos., Inc. v. Wolf, 52 N.Y.2D 394, 438 N.Y.S.2d 482, 486, 420 N.E.2d 363, 367 (1981)).

Mr. Huss argues that the non-competition and confidentiality provisions of IML's P&Ps are unenforceable under New York law because they are unreasonable in scope. Mr. Huss claims that Section 12.1 of the P&Ps is overly broad because it seeks to restrain the disclosure of all

information related to the company.[7] In <u>L.I. City Ventures v. Urban Compass, Inc.</u>, 2019 U.S. Dist. LEXIS 7782, at *36 (S.D.N.Y. Jan. 16, 2019), the court found the non-disclosure provision to be impermissibly overbroad because it prevented the disclosure of information that is publicly available and that the rest of the world can use, such as real estate listing information. The agreement restricted the disclosure of material regardless of whether that material constitutes a trade secret or is otherwise proprietary and confidential. <u>Id.</u> at *37. In the present case, there is a dispute as to whether the information IML is attempting to restrict is considered a trade secret or proprietary.

Mr. Huss also argues that a restrictive covenant is "overly broad where it is not targeted to solicitation of customers with whom employee acquired a relationship through his employment." <u>Veramark Techs. Inc. v. Bouk</u>, 10 F. Supp. 3d 395, 407 (W.D.N.Y. 2014). Section 3.7 of IML's Policies and Procedures prohibit an IBO from sponsoring or recruiting "any fellow IML IBO or customer for any other direct sales or network marketing business, unless that fellow IBO or customer was personally sponsored by such IBO," including those individuals with whom the Affiliate had no personal relationship. Mr. Huss's reliance on <u>Bouk</u> and other employment cases involving restrictive covenants that deprived the former employee from his "ability to earn a living" is misplaced. <u>Bouk</u>, 10 F. Supp. 3d at 403.

The subject non-solicitation provision expressly permits Mr. Huss to work for any other business after he leaves IML. Pl.'s Ex. 1, P&Ps § 3.7.  New York law permits restrictive covenants that prohibit a former employee from using information or relationships developed while employed to recruit the former employer's personnel or customers. <u>See BDO Seidman v.</u>

---

[7] Section 12.1 of the P&P states: "By agreeing to the IML IBO Agreement, the IBO acknowledges that business reports, lists of Customers and IBO names and contact information and any other information, which contains financial, technical or other information both written or otherwise circulated by IML or pertaining to the business of IML (collectively "Reports"), are confidential and proprietary information and trade secrets belonging to IML."

Hirschberg, 93 N.Y. 2d at 392-393; Brown & Brown v. Johnson, 25 N.Y. 3d 364, 371-372 (2015) (narrowing a restrictive covenant that "was overbroad to the extent that it prohibited [the defendant] from working with *any* of plaintiffs' … customers, even those [the defendant] had never met, did not know about and for whom [they] had done no work"). In BDO Seidman, the court held on its specific facts that a restrictive covenant that prohibited solicitation of customers with whom the employee did not have a relationship may be overbroad, the court recognized that "[a] different result might obtain had BDO submitted any proof that defendant had used confidential firm information to attract BDO clients with whom he had not had a relationship." BDO Seidman, 93 N.Y.2d 382, 392 n.2 (1999); see Mercer Health, 307 F. Supp. 3d at 349 (finding non-solicitation provision as reasonable under New York law because it only applied to clients "with whom the Individual Defendants had contact or obtained confidential information about").  IML has shown that Mr. Huss has relied on IML's confidential and trade secret information to target and recruit IML Affiliates and customers in violation of the P&Ps.

In his supplemental memorandum, Mr. Huss argues, without legal support, that Section 3.7(b) of the P&Ps is overbroad because it "seeks to restrain an [A]ffiliate from responding to inquiries made by another IBO or Customer after that affiliate has ceased to be an IBO." Supplemental Response at 6.  Mr. Huss's argument lacks merit. Section 3.7 only prohibits a former IBO from responding to inquiries with "actual or attempted solicitation, enrollment, encouragement, or effort to influence … another IBO or Customer to enroll or participate in any direct sales or network marketing company."  Pl.'s Ex. 1, P&Ps § 3.7(b).

The non-disclosure covenant in Section 12.3(a)-(c) is also reasonable in scope.  Section 12.3 sets forth the "Obligation of Confidentiality" and provides: (a) During the term of the IML IBO Agreement and for a period of one (1) year after the termination or expiration of the IBO

Agreement between the IBO and IML, the IBO shall not …(c) [u]se or disclose to any person or entity confidential information contained in the reports, including the replication of the genealogy in another network marketing company." Pl.'s Ex. 1, P&Ps § 12.3(a)-(c).  "[N]on-disclosure covenants are enforceable under New York law if the restrictions are reasonable and related to the disclosure of confidential customer information or trade secrets." Integra Optics, Inc. v. Nash, No. 2018 WL 2244460, at *7 (N.D.N.Y. April 10, 2018) (citation omitted).  In Integra Optics, the court acknowledged that "restrictions of unlimited duration on non-disclosure covenants have been found to be reasonable under certain circumstances." Id. (citations omitted). Applying New York law, the court found a restriction of five years "would be reasonable given the nature of the information and competitiveness of the market." Id. (citation omitted).  The undersigned finds the one-year non-disclosure agreement reasonable and enforceable.

Mr. Huss's argument that the confidentiality obligations are overbroad because they seek "to restrain the disclosure of all information related to the company" lacks merit. Supplemental Response at 5. The subject confidentiality provision is limited to "the information in the Reports" which makes the provision reasonably limited under New York law.  See Integra Optics, 2018 WL 2244460, at *7 (holding non-disclosure covenant unlimited in duration and worldwide in scope was reasonable given the possibility that the former employee would "likely recall and use the proprietary sales and customer-related information with which he had been entrusted during his employment"); Ecolab, 753 F. Supp. at 1103 (enforcing confidentiality restrictions not limited in temporal scope and broadly applying to any "information … not generally known about the Company's business"); Testing Servs., N.A. v. Pennisi, 443 F. Supp. 3d 303, 323 (E.D.N.Y. 2020).  The undersigned finds the IML has shown that its confidentiality provision is reasonable and enforceable under New York law.

The undersigned finds that IML has established that the restrictive covenants in Sections 3.7 and 12.3 of the P&Ps are reasonable in scope and time, 6 months and one year, respectively. The restrictive covenants are necessary to protect IML's business interests and do not impose an undue burden on Mr. Huss or prevent him from earning a livelihood. The restrictive covenants prohibit Mr. Huss from misusing IML's proprietary information and soliciting Affiliates whom Mr. Huss did not sponsor in a way that would damage IML and the other Affiliates who have worked hard to build their marketing networks.

(vi)    Mr. Huss Breached His Contractual Obligations to IML

As the undersigned's findings of fact reveal, IML has met its burden of persuasion by showing that Mr. Huss has breached the P&Ps non-solicitation (§ 3.7) and confidentiality (§12.3) provision. Within six (6) months after Mr. Huss left IML, Mr. Huss has breached the non-solicitation provision by soliciting IML Affiliates whom he did not directly sponsor at IML to join Well Beyond. For example, Mr. Huss attempted to recruit Messrs. Scott, Wilkins and Rapp, former IML Affiliates whom Mr. Huss did not sponsor, to join him at Well Beyond by purchasing airline tickets for travel to Utah to meet the founders of Well Beyond.

Additionally, Mr. Huss breached the P&Ps confidentiality provisions by using confidential information to compete with IML or using confidential information for a purpose "other than promoting [his] IML business." On June 8, 2020, Mr. Huss sent images of IML's "Placement Tree" genealogy information to IML Affiliates Ms. Lantigua and Mr. Abdalla, to recruit them to Well Beyond. There are many additional examples of Mr. Huss's breaches.

(v)    IML Has Been Damaged

IML has been damaged by Mr. Huss's breaches as discussed in the irreparable harm section below.  The undersigned finds that IML has shown a substantial likelihood of success on its breach of contract claim to warrant a preliminary injunction.

2.    Misappropriation of Trade Secrets / Violation of the Defend Trade Secrets Act

The Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1), *et seq*., ("DTSA"), authorizes a private civil action for misappropriation of trade secrets and provides in pertinent part: "[a]n owner of a trade secret that is misappropriated may bring a civil action … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

18 U.S.C. § 1836(b)(1). Under the DTSA, "trade secret" is broadly defined as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, memorialized physically, electronically, graphically, photographically, or in writing if –
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3)(A), (3)(B). The DTSA defines "misappropriation" as the

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
> (i)    used improper means to acquire knowledge of the trade secret; or
> (ii)   at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
> (I)    derived from or through a person who had used improper means to acquire the trade secret;
> (II)   acquired under circumstance giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III)    derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii)    before a material change of the position of the person, knew or had reason to know that—

(I)    the trade secret was a trade secret; and

(II)    knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).  The DTSA definition of "improper means" includes a "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6).

Under the DTSA, a trade secret is any information that the plaintiff has taken reasonable measures to keep secret, that derives independent economic value from not being generally known, and that is not readily ascertainable through proper means. See 18 U.S.C. § 1839. "To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." ExpertConnect, L.L.C. v. Fowler, 2019 WL 3004161, *4 (S.D.N.Y. July 10, 2019) (citing 18 U.S.C. § 1836(b)(1)). To prevail on a claim for misappropriation of a trade secret under the DTSA, a plaintiff must show that the trade secret was: "(A) acquired by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosed by another without express or implied consent."  Uni-Systems, LLC v. U.S. Tennis Ass'n, Inc., 350 F. Supp. 3d 143, 171 (E.D.N.Y. 2018); See Trinity Graphic, USA, Inc. v. Tervis Tumbler Co., 320 F. Supp. 3d 1285, 1293 (M.D. Fla. 2018)[8] (To prove trade secret misappropriation under the DTSA, IML must "plausibly allege that it (i) 'possessed information of an independent economic value' that (2) 'was lawfully obtained by' the plaintiff and (b) for which the plaintiff 'took reasonable measures to keep secret,' and (ii) the defendant 'used and/or disclosed that

---

[8] In Trinity Graphic, the district court analyzed the claims pursuant to a motion to dismiss rather than a motion for preliminary injunction based on breach of a restrictive covenant and misappropriation of a trade secret under the DTSA.

information,' despite (iii) 'a duty to maintain its secrecy.'") (quoting <u>Primo Broodstock, Inc. v. Am. Mariculture, Inc.</u>, 2017 WL 1502714, at *11 (M.D. Fla. Apr. 27, 2017) (other citation omitted)).

Under New York law, "'[a] trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it.'" <u>Intertek Testing Services, N.A., Inc. v. Pennisi</u>, 443 F. Supp. 3d 303, (E.D.N.Y. 2020) (quoting <u>E.J. Brooks Co. v. Cambridge Sec. Seals</u> 31 N.Y.3d 441, 452, 80 N.Y.S.3d 162, 105 N.E.3d 301 (N.Y. 2018)). New York courts consider the following six factors to determine whether information constitutes a trade secret:

> "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

<u>Pennisi</u>, 443 F. Supp. 3d at 338 (quoting <u>Faiveley Transport Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 117 (2d Cir. 2009)); accord <u>North Atlantic Instruments, Inc. v. Haber</u>, 188 F.3d 38, 44 (2d Cir. 1999). "These factors are also instructive in analyzing a claim under the DTSA." <u>Id</u>. (quoting <u>Uni-Systems, LLC v. U.S. Tennis Ass'n, Inc.</u> 350 F. Supp. 3d 143, 172 (E.D.N.Y. 2018)).

IML has shown that there is a substantial likelihood that it will succeed on the merits of its trade secrets claim. First, IML took reasonable steps to keep secret the information that had independent economic value that was lawfully owned by IML. The web of information regarding IML's marketing networks that was available online in IML's back office and included genealogy information, earning rates, decline reports, and specific details of IBO sponsorship networks constitutes IML's trade secrets. Brown Decl. ¶¶ 16, 19; T. 25:11-16, 49:4-14. Although

some of the information is public, it is the compilation of information, which does not exist

outside of IML's business, that is both secret and extremely valuable, as Mr. Huss's improper

use shows. Brown Decl. ¶¶ 20, 24; T. 77:10-78:7, 79:22-80:2.  In less than six months, Mr. Huss

recruited 4,286 people into his Well Beyond genealogy. Huss Dep. 27:18-22; T. 125:23-126:8.

Courts have provided trade secret protection to such compilations of information.  In

WorldVentures Mktg., LLC v. Rogers, 2018 WL 4169049, at *6 (E.D. Tex. Aug. 30, 2018),

which is factually similar and instructive, the court rejected the defendant's argument that

"genealogy cannot be a trade secret because the identities of WorldVentures Representative are

heavily publicized by World Ventures." Id. The WorldVentures court explained that the

defendant's argument "mischaracterizes the nature of WorldVentures' trade secret with respect

to its genealogy."  The court acknowledged that although "the mere identity and rank of a

Representative is not a trade secret," the "manner in which the Representatives are associated

with one another, i.e., the genealogy" is.  Id.  The WorldVentures court held that "genealogy [] is

one of the most closely guarded secrets in any multilevel marketing company."  Id.

The undersigned agrees and finds that the IML IBO genealogies in the present case

constitute trade secrets under the DTSA. See In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009)

(applying New York law and explaining that "[c]onfidential proprietary data relating to pricing,

costs, systems, and methods are protected by trade secret law"); see also, Freedom Med., Inc. v.

Sewpersaud, 2020 WL 3443837, at *3 (M.D. Fla. June 23, 2020) (finding that compilations of

"business information and marketing strategies" that help a company "maintain its competitive

position" constitute trade secrets under the DTSA).  The fact that some of the constituent parts of

the information may be publicly available does not negate the trade secret protection. See

Pennisi, 443 F. Supp. 3d at 341 (explaining that "[w]hile the identity of plaintiff's customers may

be readily ascertainable from public sources … [the plaintiff's] pricing information and client contacts may not be"); see also Jabil Inc. v. Essentium, Inc., 2020 WL 708140, at *4 (M.D. Fla. Feb. 12, 2020) (recognizing that under the DTSA, "[e]ven if all of the information is publicly available, a unique compilation of information which adds value to the information, also may qualify as a trade secret").  In Pennisi, the court explained that "[i]n light of the care with which plaintiff guarded [its confidential information] and the plain terms of its employment agreements with the individual defendants, it would be difficult to conclude that the individual defendants were unable to discern their responsibilities with respect to plaintiff's trade secrets and confidential information, including its client list and pricing information." Pennisi, 443 F. Supp. 3d at 341.

In the present case, IML is the legal owner of the trade secrets at issue.  IML owns each of its customer and affiliate lists and genealogy. Section 12.2 of the P&Ps expressly provides that IML owns the information contained in the Reports.  P&Ps §12.2, Pl.'s Ex. 1. The DTSA defines the "owner" of the trade secret as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4).

IML takes reasonable steps to protect its trade secrets including: securing access to its online portal and updating its access restrictions multiple times each day to ensure that only authorized personnel have access to the portal and IML's products and information; and protecting the secrecy of contact information available on its invite-only group chats by closely monitoring those chat and promptly terminating access for anyone who is no longer affiliated with IML. Pl.'s Ex. 1, §12 (P&Ps "Proprietary Information & Trade Secrets"); Brown Decl. ¶¶ 16, 21-23; T. 15-25:10, 28:25-29:14, 30:1-10; 151:12-19.

Mr. Huss argues that IML's trade secret claims fail because the rank of certain IML IBOs may be publicly available and because customers are invited in certain IBO-sponsored group chats. Defendant's Supplemental Memorandum at 8-10.  Mr. Huss's arguments are like those made and rejected by the court in <u>WorldVentures Mktg.</u>, 2018 WL 4169049, at *6.  Mr. Huss's reliance on Mr. Austin's testimony regarding group chats that he personally hosted may include some customers is misplaced.  Defendant's Supplemental Memorandum at 9.  IML's trade secrets claims are based on information gained from IML-sponsored group chats. Mr. Huss admits that IML hosted "Chairmen" group chats were IML invite-only.  IML immediately removed Mr. Huss when he was terminated. Joint Stip. ¶¶ 21-22: T. 26:5-14; 151:12-19.  IML undertook reasonable measures to ensure that only authorized affiliates had access and participated.  Absolute secrecy is not required; an entity must take reasonable measures to protect its secrets. <u>See</u> <u>Telerate Sys., Inc. v. Caro</u>, 689 F. Supp. 221, 232 (S.D.N.Y.  1988) (applying trade secret protection under New York law to information that "was revealed to various outside parties" because "absolute secrecy is not required" where a party "has taken substantial measures to safeguard the secrecy"); <u>see also</u> <u>S. Field Maint. & Fabrication LLC v. Killough</u>, 2018 WL 4701782, at *5 (M.D. Ala. Oct. 1, 2018) (analyzing claims under the DTSA and explaining that "[r]easonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required" and "[m]measures taken to protect secrecy when information is disclosed to a customer present different fact than a situation where information is made public").

Mr. Huss claims that because IML encouraged him to save confidential information on his personal device the IML information is not a trade secret. Response at 11. Using personal devices to perform company-related work does not negate trade secret protection. <u>See</u> <u>Coihue v.</u>

PayAnyBiz, 2018 WL 7376908, at *5 (S.D. Fla. Feb. 6, 2018) (rejecting argument in a DTSA

that the plaintiff could not "establish that [it] took reasonable efforts to maintain the secrecy of

the trade secrets" where the plaintiff permitted the defendant "to store trade secrets in his

personal computer and cell phone"); see also First Command Fin. Planning, Inc. v. Valez, 2017

WL 2999405, at *2 (N.D. Tex. May 8, 2017) (granting injunction against independent contractor

under the Uniform Trade Secrets Act even though the independent contractor retained "personal

email addresses and cell numbers … on his cell phone").

Third, IML has shown that Mr. Huss had a duty to maintain the secrecy of IML's trade

secrets.  Section 12 of IML's P&Ps requires Affiliates to acknowledge that IML owns the

information contained in the Reports and prohibits disclosure of confidential information

contained in the Reports outside of IML. Pl.'s Ex. 1, P&Ps §§12.2-12.3.  Mr. Huss agreed to the

P&Ps and had a duty to maintain the confidentiality of IML's trade secrets.

The undersigned finds that IML has established a substantial likelihood of success on the

merits of its trade secrets claim.

**B.   Irreparable Harm to IML If Relief Is Denied**

IML has shown that it has suffered irreparable harm due to Mr. Huss's conduct and that

IML will continue to suffer irreparable harm if Mr. Huss is not enjoined from breaching the

P&Ps and misappropriating IML's trade secrets.

"The basic requirements to obtain injunctive relief have always been a showing of

irreparable injury and the inadequacy of legal remedies." Ticor Title Ins. Co. v. Cohen, 173 F.3d

63, 59 (2d Cir. 1999) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (other

citation omitted)). In Ticor, the Second Circuit agreed with the district court that irreparable

harm was shown and explained that "it would be very difficult to calculate monetary damages

that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Id.

The evidence reveals that IML has suffered strained relationships with its customers and Affiliates as well as harm to its goodwill and such harm continues due to Mr. Huss's wrongful conduct.  IML has lost hundreds of customers and Affiliates and Mr. Brown estimates the loss has cost IML more than $50,000-$75,000 per month. Pl.'s Ex. ¶ 36; Brown Decl. ¶¶ 37-38, T. 38:6-39:1; Pl.'s Ex. 26a, Huss Dep. 181:25-182:8; Pl.'s Ex. 21b, Austin Decl. ¶¶ 6, 11, 13-14; Pl.'s Exs. 8, 9, 17.  IML asserts that it is impossible to calculate the full scope of IML's damages as the amount of business and revenue that would have been generated by the customers and Affiliates recruited by Mr. Huss cannot be calculated as is the amount of revenue that would have been generated by those customers and new IML Affiliates that would have been recruited by IML Affiliates had they not left IML to join Mr. Huss.   Additionally, the evidence reveals that Mr. Huss's conduct has substantially damaged existing IML Affiliates whose downline networks Mr. Huss recruited. T. 190:13-192:18.   These existing IML Affiliates have at least lost thousands of dollars in lost income, but the full extent of their losses cannot be calculated.  T. 212:6-10; Pl.'s Ex. 21b, Austin Decl. ¶ 13.

**C.  Injury to IML Outweighs Potential Injury to Huss If Relief Is Granted**

The injury to IML outweighs the potential harm to Mr. Huss if he is enjoined.  The evidence shows the substantial injury IML is suffering due to Mr. Huss's misappropriation of trade secrets and breach of the P&Ps prohibition of recruiting non-sponsored IML Affiliates. Mr. Huss will not suffer harm by being deprived of the ability to disseminate and use IML's Affiliate lists, customer lists, and other trade secrets.  See Tracfone Wireless, Inc. v. Hernandez, 196 F. Supp. 3d 1289, 1302 (S.D. Fla. 2016) (finding that the balance of hardships weighed

heavily in the plaintiff's favor because the defendant had "no legitimate interest in perpetrating the [theft[" and the defendant's "livelihood d[id] not rely on defrauding [the plaintiff's] customers through willfully infringing [the plaintiff's] trademarks and unlawfully acquiring [the plaintiff's] [s]ervice"). Like <u>Hernandez</u>, Mr. Huss "cannot complain of harm from an injunction preventing further violations [of his agreement with IML]." <u>Id</u>.

Mr. Huss's only claimed potential loss is an estimated "$50,000 in gross revenue he would allegedly earn by soliciting non-sponsored IML Affiliates and customers after November 1, 2020. Response at 18; Huss Decl. ¶ 49 ("I would lose that gross revenue if a preliminary injunction … is entered in this case.").  As Mr. Huss implicitly admits, such losses result from his failure to comply with his obligations under IML's restrictive covenants in the P&Ps.  <u>See</u> <u>Winmark Corp. v. Brenoby Sports, Inc.</u>, 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014) ("Although [the defendants] would be harmed by not continuing to receive the percentage of sales from [operating their business], [any] harm suffered … was brought about by [the defendants'] own actions in refusing [to abide] by their contractual obligations to [the plaintiff]").

The undersigned finds that the balance of harms weighs in favor of granting IML a preliminary injunction.

### D.  <u>Preliminary Injunction Will Not Disserve the Public Interest</u>

The public policy of New York favors enforcement of reasonable restrictive covenants. <u>See</u> <u>Intertek Testing Services, N.A., Inc. v. Pennisi</u>, 443 F. Supp. 3d 303 (E.D.N.Y. 2020). "'[I]njunctive relief would serve the public interest by ensuring that reasonable restrictive covenants into which the parties voluntarily entered are enforced,' … and protecting plaintiff's legitimate interest in maintain the value of its business relationships; the benefit of its bargain …; and the secrecy of its trade secrets and confidential information." <u>Pennisi</u>, 443 F. Supp. 3d at 347

(internal citations omitted).  Mr. Huss argues that an injunction would be adverse to the public interest because IML has failed to establish a substantial likelihood of success on the merits and has failed to show that the restrictive covenants are valid and enforceable to protect any legitimate business interest. Defendant's Proposed Findings of Fact and Conclusions of Law at 23 (DE# 11/12/20)(citing United Credit Recovery, LLC v. Wells Fargo Bank, N.A., 12-21692-CIV, 2012 WL 12844733, at *6 (S.D. Fla. Oct. 10, 2012); GPS Indus., LLC v. Lewis, 691 F. Supp. 2d 1327, 1339 (M.D. Fla. 2010)).  The undersigned disagrees. IML has satisfied its burden by showing a substantial likelihood of success on the merits of its breach of contract claim and its trade secrets claim. The undersigned finds that an injunction that prohibits Mr. Huss from continuing to misappropriate IML's trade secrets and breach IML's restrictive covenants will not disserve the public interest.

## II.   **Scope and Duration of Injunction**

The plaintiff seeks to enjoin Mr. Huss and third parties who receive actual notice of the preliminary injunction order and who are acting or working on Mr. Huss's behalf, at his direction, or in active concert or participation with him (collectively the "Enjoined Parties"), whether directly or indirectly, on their own, or through other individuals or entities, and until further Order from the District Court, from:

(1) misappropriating IML's proprietary and trade secret information; and

(2) continuing to breach IML's P&Ps':

    (a) non-solicitation provisions for a period of six months following the order imposing the preliminary injunction; and

    (b) non-disclosure provisions for a period of one year following the order imposing the preliminary injunction.

The undersigned finds that enjoining third parties acting in concert with Mr. Huss is consistent with Rule 65(d) of the Federal Rules of Civil Procedure, which authorizes injunctions to bind a party's "officers, agents, servants, employees, and attorneys," and all "other persons who are in active participation." Fed. R. Civ. P. 65(d); see Hudson Chromium Co. v. Pollack, 50 A.D.2d 771, 772 (N.Y. App. Div. 1975)(applying New York law and enjoining the defendant and third parties under his direction or acting in concert with him); see also Solvay Specialty Polymers USA, LLC v. Liu, 331 F.R.D. 187 193 (N.D. Ga. 2019)(In an action under the DTSA, the court enjoined the defendant "and all those in active concert and participation with him … from disclosing, transferring, or using any [of plaintiff's] trade secret and confidential information or material that he acquired by virtue of his employment."); see also Manitowoc Co. v. Brisch, 2015 WL 2374149, at *2 (M.D. Fla. 2015); and U.S. Lawns, Inc. v. Landscape Concepts of CT, LLC, 2016 WL 9526340, at *7 (M.D. Fla. Oct. 31, 2016) (acknowledging that Florida courts enforce non-compete agreements against the former employee who signed the agreement as well as his new employer).  Where, as here, the evidence shows that third parties acted in concert with Mr. Huss to recruit IML Affiliates, an injunction that includes such third parties is warranted.

New York law permits the court to impose the contractual duration of the restrictive covenants from the date of entry of the preliminary injunction order where, as here, the defendant's wrongful conduct has been continuous and the period under the restrictive covenant has expired. See New York Real Estate Inst., Inc. v. Edelman, 42 A.D.3d 321, 322 (N.Y. App. Div. 2007) ("Where, as here, a party unilaterally breaches an agreement not to compete and the time period during which competition was precluded has since expired, such time period may be extended for the length of time that the offending party was in violation of the agreement."); see

also Edwards Moving & Rigging, Inc. v. Jenkins, 2020 WL 1545871, at *4 (M.D. Fla. April 1, 2020) (extending non-compete period for two years).  Mr. Huss has been violating the restrictive covenants for more than six months and should not benefit from his wrongful conduct.  The undersigned recommends that the non-compete provision be enforced for a period of six months from the date of entry of the preliminary injunction.  The court should enforce the confidentiality provision for one year from the date of entry of the preliminary injunction.

### RECOMMENDATION

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that the Plaintiff's Expedited Motion for Preliminary Injunction (DE# 37, 9/8/20) (SEALED) be GRANTED.

The parties will have fourteen (14) days from the date of receipt of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Ursula Ungaro, United States District Court Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C § 636(b)(1); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1191-1192 (11th Cir. 2020); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

RESPECTFULLY SUBMITTED at Miami, Florida this 25th day of November, 2020.

JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE